IRON MOUNTAIN SECURITY
STORAGE CORPORATION

v.

AMERICAN SPECIALTY FOODS, INC.,
and Iron Mountain, Incorporated.

Civ. A. No. 77–3276.

United States District Court,
E. D. Pennsylvania.

Sept. 6, 1978.

Spencer Ervin, Jr., Philadelphia, Pa., Charles W. Morse, Jr., Boston, Mass., for plaintiff.

Richard M. Shusterman, Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

This is a diversity action[1] for a judgment declaring the rights and obligations of the parties under a contract between plaintiff, Iron Mountain Security Storage Corporation (IMSSC), and its debtor, American Specialty Foods, Inc. (ASF). The case is before me on a motion to dismiss defendants' counterclaim.

This controversy began with the divestment of IMSSC, a company providing record storage services in a New York cave, by its parent holding company, Iron Mountain, Inc. (Iron Mountain) in April 1975. Although not explained in the pleadings,[2] the parties agree that this event occurred as a result of Iron Mountain's poor financial condition. In addition to other debts, Iron Mountain owed a large sum of money to Schooner Capital Corporation (Schooner) and FNCB Capital Corporation (FNCB), and it was in default. In return for cancellation of the debt, Iron Mountain agreed to sell Schooner and FNCB all of its IMSSC stock (100% of the preferred, 98.82% of the common).

At this time, Iron Mountain also was in debt to IMSSC for $2,248,332 for cash borrowed from IMSSC prior to 1975. Some of that cash had been invested by Iron Mountain in open account advances to another of its subsidiaries, ASF, a company engaged in mushroom production which also serves as a holding company for subsidiaries producing macaroni and tomato products. Iron Mountain owned and continues to own all of ASF's common stock, and, in 1975, ASF was indebted to Iron Mountain for an amount in excess of $5,000,000. As part of the IMSSC sale transaction, the parties agreed that Iron Mountain's debt to IMSSC would be assumed by ASF; assumption of that debt apparently would setoff some of ASF's debt to Iron Mountain.

The transaction was consummated on April 30, 1975, when IMSSC delivered to ASF Iron Mountain's promissory note for $2,248,332 in exchange for a new promissory note from ASF for the same amount, payable in five years. In addition to the note transfer, the executive officers of IMSSC and ASF executed a "Note Exchange and Option Agreement," which provides:

"ASF shall have the right and option, exercisable at any time after April 1, 1976 and prior to the date the ASF [Promissory] Note matures and is payable in accordance with its terms, to repurchase from IMSSC the ASF Note at its then Formula Value (as defined in Section 4 hereof) payable in cash within 15 days of ASF delivering to IMSSC its notice of intent to exercise its option rights . . . .."

Section 4.C. of the Agreement defines "Formula Value" as follows:

"Formula Value shall equal the greater of:

(1) The Available Net Worth of ASF (but not in any event more than $2,248,332); or

(2) The sum of $22,483, representing 1% of the principal amount of the ASF Note."

The remainder of § 4 states how to compute the "Available Net Worth of ASF" referred to in § 4.C.(1); generally, that figure consists of certain ASF asset values minus certain liability values "as of the last day of the month next preceding the month in which ASF exercises its repurchase option."

On June 15, 1977, ASF notified IMSSC of its intention to repurchase the promissory note for $22,483, which, in its view, was the

---

1. See 28 U.S.C. § 1332(a)(1). The complaint avers that plaintiff is a citizen of New York and defendants are citizens of Delaware and Pennsylvania. Defendants have denied Pennsylvania citizenship. The amount in controversy exceeds $10,000.

2. Except as stated, the facts are as set forth in the counterclaim, the allegations of which are accepted as true for purposes of this motion. The counterclaim incorporates defendants' answer to the complaint, and the answer admits some of the complaint's allegations.

correct "Formula Value" under § 4.C. of the Option Agreement. On June 23, 1977, ASF mailed IMSSC a certified check for $22,483, which contained a statement that endorsement by the payee "acknowledges that the proceeds constitute the full and complete repurchase price of the Maker's Note." On that same date, IMSSC notified ASF that it believed the "Formula Value" was a sum in excess of $22,483. On June 27, 1977, it returned the ASF check without endorsement or negotiation, explaining that the restrictive legend on the check made it unacceptable. On June 30, 1977, ASF had the Bank of Delaware wire-transfer funds in the amount of $22,483 to parties acting on IMSSC's behalf, and IMSSC had the funds placed in an escrow account for its own benefit.

On September 22, 1977, IMSSC instituted this suit against ASF and Iron Mountain, contending that ASF is obligated to pay an additional $891,977 for repurchase of the promissory note. Generally, it asserts that, in view of certain debt reductions by ASF, the "Available Net Worth of ASF" for purposes of § 4.C. of the Option Agreement is $914,460, and that that amount therefore was the correct "Formula Value" for repurchase of the note. IMSSC seeks a judgment declaring that it is entitled to the additional money and that it may hold the ASF promissory note until the additional funds are received. In addition, it asks for a declaration that the $2,248,332 promissory note from Iron Mountain (which IMSSC transferred to ASF on April 30, 1975 in return for ASF's note) be deemed to be held by ASF in constructive trust as security for the additional funds owed IMSSC and that IMSSC and Iron Mountain be enjoined from extinguishing indebtedness on that note until that additional money is paid.

Defendants filed an answer and counterclaim on November 29, 1977. In the answer, they contend that the "Available Net Worth of ASF" when computed according to the Option Agreement is "0" and that the correct "Formula Value" therefore is $22,483, the amount tendered. The counterclaim is in two counts. The first asserts a claim for damages for breach of the Option Agreement. The second count asserts a tort claim for compensatory and punitive damages for what defendants characterize as "bad faith or malicious breach of contract" (Defendants' Memorandum at 16). IMSSC has moved to dismiss the counterclaim.

## DISCUSSION

### Count I

The first count of the counterclaim alleges that ASF exercised its right under the Option Agreement to repurchase the ASF promissory note, paying the purchase price provided in the Agreement, but that IMSSC then breached its obligation under the Agreement to return the note to ASF. It avers that "[a]s a direct and proximate result of the aforesaid breach of contract," ASF has suffered certain specified damages, and, in addition to the damages, it seeks to enjoin IMSSC from enforcing the note and to have IMSSC return the note to ASF.

■ IMSSC contends that Count I fails to state a claim upon which relief can be granted. Its main argument appears to be that this portion of the counterclaim is superfluous since it is just a "mirror image" of plaintiff's claim and defendants can achieve all they seek to recover by successfully defending against IMSSC. Not surprisingly, little authority is cited in support of this argument.[3] I know of no rule pre-

---

3. Plaintiff relies on only one case, *Green Bay Packaging, Inc. v. Hoganson & Assoc., Inc.*, 362 F.Supp. 78 (N.D.Ill.1973). That case did dismiss counts of a counterclaim because they "merely restate[d] an issue already before [the] Court" (362 F.Supp. at 82), but I have found no other case which has followed that holding or is in accord with its reasoning. Most of the cases cited in support of the holding in *Green*

*Bay Packaging* do not deal with counterclaims and none of them held that a counterclaim could be dismissed merely because it duplicated issues in the complaint. *See United States Fidelity & Guar. Co. v. Pierson*, 89 F.2d 602, 605 (8th Cir. 1937) (upholding striking of portion of answer containing "an allegation of wholly impertinent matter or an allegation of evidentiary matter"); *Control Data Corp. v.*

venting the assertion of a counterclaim merely because the theory relied upon is the converse of that in the complaint.

■ Defendants would have every right to seek a judgment declaring that *their* interpretation of the contract was the correct one. A ruling adverse to plaintiff on plaintiff's claim would merely result in a judgment that plaintiff was not entitled to the relief requested; although it might logically follow from that judgment that defendants' interpretation of the contract was the correct one, defendants would not be entitled to a judgment to that effect unless they specifically requested one. The claim made in Count I seeks more than a declaration in favor of defendants' interpretation of the contract, however; it seeks damages for breach of the contract by the plaintiff, IMSSC. As explained in their brief, defendants' theory of recovery is that, by refusing to surrender the promissory note and wrongfully asserting that ASF was still indebted to it, plaintiff caused defendants to suffer substantial consequential damages for which it is liable. Even under plaintiff's superfluity theory, therefore, the counterclaim would not be subject to dismissal, since it raises damages issues beyond the scope of the complaint. Since this aspect of the counterclaim arises out of the same set of facts as those set forth in the complaint, it is "compulsory" under Federal Rule of Civil Procedure 13(a) and would be nonlitigable under res judicata principles if not asserted as part of this case. *See generally* 3 Moore's Federal Practice ¶ 13.12[1] (2d ed. 1974). Count I will not be dismissed as superfluous.

■ In support of its motion, IMSSC relies on § 8–315(3) of the Uniform Commercial Code, which authorizes specific enforcement of the right to obtain possession of a security.[4] Assuming that this section is applicable to the facts of this case, it does not aid plaintiff's argument. The section merely authorizes a specific form of relief; it does not purport to provide an exclusive remedy and does not state that other forms of relief, such as damages, are proscribed. *See* UCC § 8–315, Comment 2. The section therefore has no bearing on defendants' damage claim.

Plaintiff's argument appears to be that the availability of a statutory right to regain possession of the promissory note under § 8–315(3) provides defendants with "a full, complete and adequate remedy" (Plaintiff's Reply Memorandum at 19) for any breach of contract that has occurred. Plaintiff adds that, since it has offered to place the note in the Court's possession pending the outcome of this case (*see generally* Fed.R.Civ.P. 67), that remedy will flow automatically to defendants if they prevail on plaintiff's claim. Even if that is true, however, it is no reason why defendants, to protect their rights, cannot formally request such a remedy by filing a counterclaim. Moreover, defendants' request for damages clearly demonstrates that, on the face of the counterclaim, return of the note is not "a full, complete and adequate remedy" since they allege that ASF has sustained monetary injury as a result of the contract breach. The dispute is not over physical possession of a piece of paper but

*International Business Mach. Corp.*, 306 F.Supp. 839 (D.Minn.1969) (striking complaint's allegations of consent decrees), *aff'd*, 430 F.2d 1277 (8th Cir. 1970); *Vignovich v. Great Lakes S.S. Co.*, 3 F.R.D. 69 (W.D.N.Y. 1942) (striking paragraphs of complaint that were not "simple, concise, and direct" as required by Fed.R.Civ.P. 8(e)(1)); *Chambers v. Cameron*, 29 F.Supp. 742 (N.D.Ill.1939) (dismissing prolix counterclaim as violating Fed.R. Civ.P. 8(a)).

4. The section provides:

"The right to obtain or reclaim possession of a security may be specifically enforced and

its transfer enjoined and the security impounded pending the litigation."

As noted in the discussion of the counterclaim's second count, the parties have not addressed the question of which state's law applies to this case. Each of the four most likely choices, Delaware, Massachusetts, New York, and Pennsylvania, have adopted UCC § 8–315(3) in identical form. *See* 6 Del.Code Ann. § 8–315(3); Mass.Gen.Laws Ann. ch. 106, § 8–315(3) (West); N.Y. U.C.C. § 8–315(3) (McKinney); 12A Pa.Stat.Ann. § 8–315(3) (Purdon).

over the fact that IMSSC's failure to surrender the note (and, as a result, its continued assertion of a substantial claim of indebtedness against ASF) has resulted in pecuniary loss. The allegations state a viable claim upon which monetary relief can be granted.

■ IMSSC contends that defendants' claim for damages is not "well pleaded", by which it apparently means that defendants have not sufficiently pleaded facts in support of their claim. Count I alleges, partly through incorporation by reference, that ASF and IMSSC had a contract regarding repurchase of the promissory note, that ASF performed its part of the contract by tendering the proper amount of money for that purchase (cf. Fed.R.Civ.P. 9(c)) but IMSSC breached its contractual obligation to transfer the note to ASF, and that ASF has suffered damages as a result of the breach. Defendants need allege no more. The Federal Rules require only "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R. Civ.P. 8(a)(2)) and state that averments "shall be simple, concise and direct" with no technical forms required (Fed.R.Civ.P. 8(e)(1)). Count I of the counterclaim meets this standard and provides sufficient facts to give plaintiff notice of defendants' claim. *See generally Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If more detail is required for plaintiff to respond, plaintiff may file a motion for a more definite statement under Federal Rule 12(e).

The motion to dismiss Count I of the counterclaim will be denied.

### Count II

The second count of the counterclaim incorporates the allegations in Count I and adds that IMSSC "had actual knowledge" that $22,483 was the correct "Formula Value" and that repurchase of the promissory note at that price was very important to ASF's ability "to continue as an economically viable profitable entity." It avers that,

nevertheless, IMSSC "wrongfully, unreasonably, unjustifiably, maliciously and wantonly" refused to surrender the note when ASF tendered the proper purchase price and continued to assert that ASF owed a substantial debt to IMSSC, causing substantial economic injury. It requests the same relief as requested in Count I, except that it adds a request for punitive damages. In their brief, defendants summarize the legal theory underlying this count as follows:

"Count II of Defendants' Counterclaim sets forth a cause of action against IMSSC based on the developing case law which has recognized that a party to a contract who either recklessly or intentionally commits a bad faith or malicious breach of the duties imposed by that contract for the purpose of causing harm to the other party to the contract is liable to tort for both the harm suffered by the injured party proximately resulting from such wrongful action and for punitive damages."

Defendants'-Memorandum at 17.

IMSSC contends that this count fails to state a claim upon which relief can be granted because no such tort action exists under Pennsylvania law. In discussing this issue, I note at the outset that this case poses potential choice of law problems that have not been addressed by the parties. The record discloses that events related to this case occurred in at least four states: Delaware, Massachusetts, New York, and Pennsylvania. The record is insufficient at this time to determine which of those states should have their substantive law applied. *See generally Melville v. American Home Assurance Co.*, 443 F.Supp. 1064, 1076–1107 (E.D.Pa.1977). In arguing this motion, the parties appear to have assumed that Pennsylvania substantive law governs, and, in the absence of any clear indication to the contrary, I shall join in that assumption for purposes of this motion.

Defendants' theory is based on decisions in various jurisdictions, led by California, allowing tort recovery for various activities of insurance companies.[5] According to de-

---

5. *E. g., Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973); *Egan v. Mutual of Omaha Ins. Co.*, 63 Cal. App.3d 659, 133 Cal.Rptr. 899 (1976); *Richard-*

fendants, the "landmark case" in this area is *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), in which the Supreme Court of California held that an insured could sue in tort for an insurance company's alleged bad faith conduct in refusing to pay a fire insurance claim.[6] The Court reasoned that "[t]here is an implied covenant of good faith and fair dealing in every contract [including insurance policies] that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." 9 Cal.3d at 573, 108 Cal. Rptr. at 484, 510 P.2d at 1036 (interpolations in original), *quoting Comunale v. Traders & General Insurance Co.*, 50 Cal.2d 654, 658, 328 P.2d 198, 200 (1958). It emphasized that this covenant was not one of the terms of the contract entered into by the parties but was an additional duty imposed on the parties as a matter of law for reasons of public policy. As a result of this nonconsensual origin of the duty, its breach "sounds in both contract and tort," and, therefore, "when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." 9 Cal.3d at 573–75, 108 Cal.Rptr. at 484–86, 510 P.2d at 1036–38. The Court held further that this liability is imposed even though the insured breached other covenants of the policy. *Id.* at 576–78, 108 Cal.Rptr. at 487–88, 510 P.2d at 1039–40.

Breach of the duty entitles the insured to recovery measured by general tort damage rules, including damages for emotional distress (*id.* at 578–80, 108 Cal.Rptr. at 488–90, 510 P.2d at 1040–42) and punitive damages (*Egan v. Mutual of Omaha Insurance Co.*, 63 Cal.App.3d 659, 133 Cal.Rptr. 899 (1976)).

Defendants assert that Count II of the counterclaim falls within the *Gruenberg* rule and that this rule would be adopted in Pennsylvania. They contend that under *Diamon v. Penn Mutual Fire Insurance Co.*, 247 Pa.Super. 534, 372 A.2d 1218 (1977), Pennsylvania imposes an implied covenant of good faith and fair dealing in contract cases, and they argue that "[t]he unmistakable trend in the Pennsylvania decision[s]" (Defendants' Memorandum at 18) points to imposition of tort liability for breach of this covenant.

As Judge Adams recently wrote,

"The task of a federal court sitting in diversity is frequently not an easy one, for it must forsake its realm of expertise and assume the aspect of a court of the forum state. Even when applying well-settled law, the federal tribunal must be alert to nuances of precedent. Where . . . a federal court is asked to pass on the implication of a declaration by a state high court of a new principle in an evolving area of the law, it must act with even greater sensitivity.

son v. Employers Liab. Assurance Corp., 25 Cal.App.3d 232, 102 Cal.Rptr. 547 (1972), *overruled in part on other grounds in Gruenberg, supra*, 9 Cal.3d at 580 n. 10, 108 Cal.Rptr. at 490 n. 10, 510 P.2d at 1042 n. 10; *United States Fidelity & Guar. Co. v. Peterson*, 91 Nev. 617, 540 P.2d 1070 (1975); *Ledingham v. Blue Cross Plan for Hosp. Care of Hosp. Serv. Corp.*, 29 Ill.App.3d 339, 330 N.E.2d 540 (5th Dist. 1975), *rev'd on other grounds*, 64 Ill.2d 338, 1 Ill.Dec. 75, 356 N.E.2d 75 (1976); *State Farm Gen. Ins. Co. v. Clifton*, 86 N.M. 757, 527 P.2d 798 (1974); *United Serv. Automobile Ass'n v. Werley*, 526 P.2d 28, 33 (Alaska 1974) (by implication). *But see Debolt v. Mutual of Omaha*, 56 Ill.App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (3d Dist. 1978). *See also Norfolk & Dedham Mut. Fire Ins. Co. v. Cumbaa*, 128 Ga.App. 196, 196 S.E.2d 167 (1973) (statutory liability).

**6.** The insured, Gruenberg, alleged that, after his business premises burned down, personnel of the insurance company falsely stated to the police that he had excessive fire insurance coverage, leading to the institution of arson and insurance fraud charges against him. While those charges were pending, the company, pursuant to the insurance policy, demanded that Gruenberg submit to questioning by its personnel. On advice of his attorney, Gruenberg refused to make any statements while the criminal charges were pending. The company then used this failure to cooperate as an excuse to deny insurance liability. The criminal charges later were dismissed by a magistrate for lack of probable cause. Gruenberg asserted that the insurance company's conduct constituted a bad faith scheme to avoid payment. 9 Cal.3d at 570–72, 108 Cal.Rptr. at 482–83, 510 P.2d at 1034–35.

. . . This endeavor is a perplexing one, but it is not one this court is free to avoid. In the course of discharging our obligation, we must choose either to reject or to accept a nascent legal rule, and thus risk distorting state law as much by an excess of conservatism as by insufficient attention to *stare decisis.*"

Becker v. Interstate Properties, *569 F.2d 1203, 1204 (3 Cir. 1977).*

Although the theory propounded by defendants is not totally without basis, particularly with respect to insurance contracts, I conclude that it would not be accepted by the Pennsylvania courts on the facts presented in this case.

Although they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensual agreements between particular individuals. In tort actions, damages are awarded to compensate the plaintiff for all loss suffered by breach of the duty, whereas in contract actions, damages are limited by the scope of the agreement and must be foreseeable at the time the agreement is made. If a tortfeasor breaches a duty imposed by society, a monetary levy beyond that which is compensatory may be imposed against him to punish the wrongdoing and serve as a deterrent; such "punitive damages" are not assessed for breach of mere contractual duties, however. These and other differences have characterized tort and contract as distinct forms of action, and the fact that tort rules usually provide greater advan-

tages for plaintiffs' recoveries has led to "more or less inevitable efforts of lawyers to turn every breach of contract into a tort." W. Prosser, *Handbook of the Law of Torts* § 92 (4th ed. 1971); quotation from *id.* at 614 (footnote omitted). In this case, the difference in rules as to availability of punitive damages [7] seems to have been a major factor prompting assertion of the tort claim since that is the only difference in the relief requested under the two counts of the counterclaim.

Pennsylvania has been careful to preserve the distinction between tort and contract. In *Glazer v. Chandler,* 414 Pa. 304, 308–09, 200 A.2d 416, 418 (1964), the Pennsylvania Supreme Court stated:

To permit a promisee to sue his promissor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions. Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy. See Developments in the Law— Competitive Torts, 77 Harv.L.Rev. 888, 968 (1964). The methods of proof and the damages recoverable in actions for breach of contract are well established and need not be embellished by new procedures or new concepts which might tend to confuse both the bar and litigants.

Although this statement was made with respect to the interrelationship of "the tort of inducing breach of contract or refusal to deal" and assumpsit (*see generally George A. Davis, Inc. v. Camp Trails Co.,* 447 F.Supp. 1304, 1308–12 (E.D.Pa.1978)), it applies with equal force to the development of

---

**7.** The rule that punitive (or "vindictive") damages are recoverable in tort but not contract actions has been followed in Pennsylvania for some time. *See, e. g., Pittsburgh, C. & St. L. Ry. v. Lyon,* 123 Pa. 140, 150, 16 A. 607, 609 (1889); *Hoy v. Gronoble,* 34 Pa. 9, 11–12 (1859). In *Hoy,* which dealt with breach of an oral contract for farm employment, the Court stated:

"[W]e think there was error in charging the jury that 'besides allowing these damages' (what the plaintiff could have made on the farm), they might also allow damages 'for

violation of faith.' This is something more than compensation. It is an allowance of vindictive damages, which is not permitted in actions for a breach of contract, with very rare exceptions, perhaps in none, except the single case of breach of promise of marriage. The violation of most contracts involves a breach of faith. If a promissor must respond in damages for that as well as for his violation of his promise, he must make duplicate satisfaction."

34 Pa. at 11.

new tort theories that would undermine traditional contract rules. The policy expressed in *Glazer* is an enlightening guide in performing the delicate task described by Judge Adams with respect to diversity cases.

 As noted, defendants' argument begins with the premise that a duty of good faith and fair dealing is an implied term in all contracts as a matter of Pennsylvania law. For purposes of this case, that can be assumed to be true. *See generally Diamon v. Penn Mutual Fire Insurance Co.,* 247 Pa.Super. 534, 550–52, 372 A.2d 1218, 1226–27 (1977); *Daniel B. Van Campen Corp. v. Building and Construction Trades Council,* 202 Pa.Super. 118, 122, 195 A.2d 134, 136–37 (1963). But it is a broad jump from that premise to the conclusion that breach of this duty should be separately actionable in tort merely because the duty is imposed by law rather than by consensual agreement of the parties. Not every breach of a legal duty is actionable in tort. *See, e. g., Manning v. Andy,* 454 Pa. 237, 310 A.2d 75 (1973) (per curiam); *Frederick L. v. Thomas,* 578 F.2d 513, 517 (3d Cir. 1978) (discussing Pennsylvania law); *Benjamin v. Global Collection Agency,* 71 Pa.D. & C.2d 56, 66–67 (C.P. Del. Cnty. 1974). Defendants have cited no Pennsylvania cases imposing tort liability in the situation at bar. It is true that contract obligations have been held to give rise to tortiously actionable duties under Pennsylvania law. *See, e. g., Evans v. Otis Elevator Co.,* 403 Pa. 13, 168 A.2d 573 (1961) (person who has contract with owner to inspect its freight elevator has duty to perform the contractual undertaking in such a manner that third persons will not be injured thereby and may be sued in tort by third person for breach of that duty). Generally, this has occurred with respect to matters beyond the scope of the contract, however—*e. g.,* personal injury to persons not parties to the contract, as in *Evans. See generally* Prosser, *supra,* §§ 92–93. Where, as in this case, the injury that occurs is within the scope of the contract itself, the policy of maintaining the distinction between tort and contract actions applies with much greater force. The injury for which defendants seek redress in the counterclaim is purely economic and is compensable in an action on the contract itself. I do not believe that Pennsylvania would superimpose tort law on that contract action merely to allow recovery of punitive damages for breach of the implied contract term.

The cases cited by defendants are readily distinguishable. In *Papieves v. Kelly,* 437 Pa. 373, 263 A.2d 118 (1970), a case which had nothing to do with contract breach, the Pennsylvania Supreme Court held that a plaintiff could recover for the tort of intentional infliction of mental distress; no such tort claim is alleged in this case. *Hanke v. Global Van Lines, Inc.,* 533 F.2d 396 (8th Cir. 1976), and *W. W. Coal Co. v. Pennsylvania National Mutual Casualty Insurance Co.,* 75 Pa.D. & C.2d 621 (C.P. Somerset 1975), merely stand for the proposition that where the factual events on which the plaintiff sues give rise to claims in both tort and contract, the measure of the plaintiff's tort recovery is not limited by the concomitant assertion of the contract claim. Of course, the issue under consideration in this case is whether the facts alleged do indeed give rise to both tort and contract claims.

In *Meyer v. Nottger,* 241 N.W.2d 911 (Iowa 1976), the Supreme Court of Iowa held that damages for emotional distress could be awarded for breach of a contract to perform funeral services and that recovery for the tort of intentional infliction of mental distress could be had in the same case. *Meyer* does not aid defendants' position, but the decision is significant for its straightforward recognition of the fact that not all contracts are the same and that certain contracts should be treated according to different rules than others, depending on the nature and character of the subject matter with which they deal or the relationship between the parties. *See* 241 N.W.2d at 920–21. That common sense reasoning points to the principal factor distinguishing the other cases relied upon by defendants: they deal with a special type of contract, an insurance policy. As Judge Huyett recently observed, "the Pennsylva-

nia courts clearly recognize insurance contracts as presenting special considerations which require the imposition of unique duties upon the insurer." *Myers & Watters Co. v. E. I. duPont deNemours & Co.,* Civil No. 76–1253, slip op. at 5 (E.D.Pa., April 25, 1978). In Pennsylvania, as in other states, the insurance industry is subject to pervasive regulation and many insurance policy terms are imposed by statute.[8] In addition, "[i]nsurance contracts continue to be contracts of adhesion, under which the insured is left little choice beyond electing among standardized provisions offered to him, even when the standard forms are prescribed by public officials rather than insurers." R. Keeton, *Insurance Law* § 6.3(a), at 350–51 (1971), *quoted in Diamon v. Penn Mutual Fire Insurance Co.,* 247 Pa.Super. 534, 551 n. 8, 372 A.2d 1218, 1226 n. 8 (1977). As a result, the Supreme Court of Pennsylvania has modified its ·application of traditional contract rules to insurance policies, explaining in *Brakeman v. Potomac Insurance Co.,* 472 Pa. 66, 371 A.2d 193 (1977)—

> "The rationale underlying the strict contractual approach reflected in our past decisions is that courts should not presume to interfere with the freedom of private contracts and redraft insurance policy provisions where the intent of the parties is expressed by clear and unambiguous language. We are of the opin-

ion, however, that this argument, based on the view that insurance policies are private contracts in the traditional sense, is no longer persuasive. Such a position fails to recognize the true nature of the relationship between insurance companies and their insureds. An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured. The only aspect of the contract over which the insured can 'bargain' is the monetary amount of coverage. And, as we have recognized, notice of accident provisions, such as that with which we are concerned instantly, are uniformly found in liability insurance policies. *Meierdierck v. Miller,* [394 Pa. 484, 486, 147 A.2d 406, 408 (1959)]. Indeed, a review of the cases indicates that often the policies express the condition in identical language. . . . Thus, an insured is not able to choose among a variety of insurance policies materially different with respect to notice requirements, and a proper analysis requires this reality be taken into account." 472 Pa. at 72–73, 371 A.2d at 196 (footnote omitted).

Similar modifications have been made in other jurisdictions. *See id.* at 73 & n. 5, 371 A.2d at 196 & n. 5 (citing cases).

The special considerations pertaining to insurance contracts explain *Gruenberg* and

---

8. *See, e. g.,* Insurance Department Act of 1921, 40 Pa.Stat.Ann. §§ 1 *et seq.* (Purdon); Insurance Company Law of 1921, 40 Pa.Stat.Ann. §§ 341 *et seq.* (Purdon); Group Life Insurance Act of 1949, 40 Pa.Stat.Ann. §§ 532.1 *et seq.* (Purdon); Newborn Children Health Insurance Act, 40 Pa.Stat.Ann. §§ 771 *et seq.* (Purdon); Individual Accident and Sickness Insurance Minimum Standards Act, 40 Pa.Stat.Ann. §§ 776.1 *et seq.* (Purdon); Unlicensed Insurers Act of 1966, 40 Pa.Stat.Ann. §§ 1006.1 *et seq.* (Purdon); Model Act for the Regulation of Credit Life Insurance and Credit Accident and Health Insurance, 40 Pa.Stat.Ann. §§ 1007.1 *et seq.* (Purdon); Automobile Insurance Act of 1968, 40 Pa.Stat.Ann. §§ 1008.1 *et seq.* (Purdon); Pennsylvania No-fault Motor Vehicle Insurance Act, 40 Pa.Stat.Ann. §§ 1009.101 *et seq.* (Purdon); Conversion of Mutual Life Insurance Companies Act of 1970, 40 Pa.Stat. Ann. §§ 1010.1 *et seq.* (Purdon); Fraternal Benefit Society Code, 40 Pa.Stat.Ann. §§ 1141–101 *et seq.* (Purdon); Unfair Insurance Practices Act, 40 Pa.Stat.Ann. §§ 1171.1 *et seq.* (Purdon); Casualty and Surety Rate Regulatory Act, 40 Pa.Stat.Ann. §§ 1181 *et seq.* (Purdon); Fire, Marine and Inland Marine Rate Regulatory Act, 40 Pa.Stat.Ann. §§ 1221 *et seq.* (Purdon); Health Care Services Malpractice Act, 40 Pa. Stat.Ann. §§ 1301.101 *et seq.* (Purdon); Voluntary Nonprofit Health Service Act of 1972, 40 Pa.Stat.Ann. §§ 1551 *et seq.* (Purdon); Pennsylvania Fair Plan Act, 40 Pa.Stat.Ann. §§ 1600.3 101 *et seq.* (Purdon); Pennsylvania Insurance Guaranty Association Act, 40 Pa.Stat.Ann. §§ 1701.101 *et seq.* (Purdon); Protection Against Uninsured Motorists Act, 40 Pa.Stat. Ann. § 2000 (Purdon); Health Plan Corporations Act, 40 Pa.C.S.A. §§ 6101 *et seq.;* Professional Health Services Plan Corporations Act, 40 Pa.C.S.A. §§ 6301 *et seq.;* Fraternal and Beneficial Societies Act of 1972, 40 Pa.C.S.A. §§ 6501 *et seq.,* 6701. *See generally* "Statutory Regulation of Insurers in Pennsylvania," Pa. Stat.Ann., tit. 40, vol. 1, xxi (Purdon 1971).

the other cases most heavily relied on by defendants. Each of the cases adopting defendants' tort theory did so with respect to an insurance contract, and each enunciated its holding in terms of insurance law.[9] Defendants have cited no case from any jurisdiction that has extended the tort law theory beyond the insurance context to breaches of other commercial contracts.[10]

The insurance law factor is sufficient to distinguish the two Pennsylvania cases on which defendants rely most heavily, *Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 134 A.2d 223 (1957), and *Diamon v. Penn Mutual Fire Insurance Co.*, 247 Pa.Super. 534, 372 A.2d 1218 (1977). In addition, however, I note that even though they dealt with insurance, those cases did not go so far as to adopt the tort theory advanced by defendants.

In *Cowden,* the question presented was described by the Court as follows:

"The basic question of law raised by this appeal relates to the nature and extent of the duty owed to an insured by his insurer against liability for personal injury to others where the insured, by the terms of the policy, cedes to the insurer the right to control litigation (falling within the insurance coverage) including possible settlement of the claim against the insured when it is apparent that a recovery, if adversarily obtained, will exceed the maximum limit of the insurer's liability under the policy." 389 Pa. at 468, 134 A.2d at 227.

The insured sued the the insurer in "trespass" for bad faith in failing to participate in a proposed settlement of a personal injury claim against him in which, pursuant to the insurance policy, the insurer controlled his defense. The settlement would have reduced the insured's potential liability for damages in excess of his insurance coverage, but would have required full payment by the insurer of the policy amount. Following collapse of the settlement efforts, the jury in the personal injury case returned a verdict against the insured which was far in excess of his policy limits and the settlement offer, requiring the insured to make greater out-of-pocket payment of damages in excess of his insurance coverage than would have been required if the settlement offer had been accepted. The insured contended that if the insurer had rejected the settlement offer in bad faith, it should be liable for the amount of out-of-pocket damages the insured had to pay that was in excess of what he was willing to contribute to the settlement. On appeal, the Pennsylvania Supreme Court agreed.[11] In California and other states, recognition of such a cause of action is considered an application of the tort theory advocated by defendants in the counterclaim in this case (*see Gruenberg,* 9 Cal.3d at 573–74, 108 Cal.Rptr. at 485, 510 P.2d at 1037), but the Pennsylvania court did not apply that analysis. Nothing that "there is a considerable divergence of opinion on the rationale of the recovery" (389 Pa. at 469, 134 A.2d at 227), it set forth its reasoning as follows:

"The reason for the rule is at once apparent when the respective rights and liabilities under an indemnity contract are considered in the light of the peculiar relationship existing between the parties where control over litigation covered by

---

9. *See, e. g., Gruenberg,* 9 Cal.3d at 595, 108 Cal.Rptr. at 486, 510 P.2d at 1038:

"It is manifest that a common legal principle underlies all of the foregoing decisions; namely, that in every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is imminent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort."

10. In *Glendale Fed. Sav. & Loan Ass'n v. Marina View Heights Dev., Inc.,* 66 Cal.App.3d 101, 135 n. 8, 135 Cal.Rptr. 802, 822 n. 8 (1977), the California Court of Appeal stated:

"While a breach of the implied covenant of good faith and fair dealing may give rise to a cause of action sounding in tort in the insurance field [citations to *Gruenberg* and other cases omitted], we are not aware of any appellate court case, and none has been cited, extending that principle to other contractual relationships."

11. The Court held, however, that bad faith was not established on the facts before it.

the policy is vested in one of the parties. In *Perkoski v. Wilson,* 371 Pa. 553, 556, 92 A.2d 189 [, 191], under an immaterially different factual situation, we said,— 'When the company voluntarily undertook the defense of [the insured] in pursuance of its privilege under the policy, it assumed a position of trust and confidence which called for the exercise of the utmost good faith, particularly in view of the possible conflict of interest between the insurer and the insured such as later developed.' And, in *Weiner v. Targan,* 100 Pa.Super. 278, 284, it was recognized that the contractual relationship under an indemnity policy was one requiring 'a high degree of good faith in the conduct of the indemnity company's counsel generally . . .' See, also, *Malley v. American Indemnity Co.,* 297 Pa. 216, 224–225, 146 A. 571, 81 A.L.R. 1322. While the contract is primarily one of indemnity, it operates at the same time to create an agency relationship in its provision for the insured's exercise of control over the disposition of claims against the insured (within the policy's limits) whether that be by settlement or litigation. Thus, both parties have definite and separate interests in the disposition of such claims. And, where there is little or, as in the instant case, no likelihood of a verdict or even a settlement within the limits of the policy's coverage, the separate interests of the parties are in effect substantially hostile. In such circumstances, it becomes all the more apparent that the insurer must act with the utmost good faith toward the insured in disposing of claims against the latter."

*Id.* at 469–70, 134 A.2d at 228.

The Court's decision thus was based on "the peculiar relationship existing between the parties," an "agency relationship" which imposed fiduciary duties on the insurer. The decision was not based on any general rule as to tortious breaches of implied covenants. Indeed, in a later decision the Court held that the cause of action it had approved in *Cowden* was actionable in as-

sumpsit, not tort. *Gray v. Nationwide Mutual Insurance Co.,* 422 Pa. 500, 506–10, 223 A.2d 8, 10–12 (1966).

In *Diamon,* the Pennsylvania Superior Court held (in an alternative holding) that insurance policies contain an implied covenant of good faith and fair dealing, breach of which is actionable in assumpsit. In the course of its discussion, the court relied heavily on *Gruenberg* for the proposition that breach of the covenant is actionable by the insured even though the insured breached other obligations imposed on him by the policy. In relying on *Gruenberg,* the court did not adopt that case's tort theory, however; it merely expressed its agreement with the conclusion that "the insurer's duty [of good faith] is unconditional and independent of the performance of [the insured's] contractual obligations." 247 Pa.Super. at 553, 372 A.2d at 1228, quoting *Gruenberg,* 9 Cal.3d at 578, 108 Cal.Rptr. at 488, 510 P.2d at 1040 (footnote omitted). In other words, it set up the implied duty as an independent covenant of the contract, breach of which is actionable in a suit "to recover on the policy" (247 Pa.Super. at 555, 372 A.2d at 1229); tort remedies never were discussed.

In summary, then, I do not believe that Pennsylvania would allow tort recovery for breach of an implied contractual duty of good faith and fair dealing where the breach occurred in an ordinary commercial contract such as the one in this case. Breach of the duty is synonymous with breach of the contract.[12] No special circumstances are present in this case that would induce adoption of a tort theory to circumvent normal contract rules, including the rule against recovery of punitive damages. The case does not involve an insurance policy, which might be subject to a different result, although, under the Pennsylvania cases, that result is uncertain. I hold that defendants have not stated a claim under the tort theory they advance. *Accord, Myers & Watters Co. v. E. I. duPont de-Nemours & Co.,* Civil No. 76–1253 (E.D.Pa., April 25, 1978).

12. *See Hoy v. Gronoble,* 34 Pa. 9, 11–12 (1859), *quoted in part in* note 7, *supra.*

**1170**

At oral argument, defendants suggested for the first time that Count II of their counterclaim alleges the tort of intentional interference with economic relationships. In making this argument, defendants relied heavily upon *George A. Davis, Inc. v. Camp Trails Co.,* 447 F.Supp. 1304, 1308–12 (E.D.Pa.1978), in which I ruled that one party to a contract may state a claim against the other contracting party under Pennsylvania law for the tort of intentional interference with economic relationships. I fail to see how the rule announced in *Davis* aids defendants here. The decision in *Davis* was based upon a careful analysis of Pennsylvania law, and I tried to make it clear that this particular tort action may be maintained against a contracting party only where the plaintiff alleges that the defendant acted with the specific intent to injure the plaintiff in its business relationships with others. 447 F.Supp. at 1311. The counterclaim here, unlike the complaint in *Davis,* contains no such allegations. Instead, Count II of the counterclaim simply alleges that IMSSC acted "wrongfully, unreasonably, unjustifiably [and] maliciously" in publicizing its claim that ASF still owes it at least $914,460 Formula Value, "although ASF knew that such statements were false and reflected adversely on the credit-worthiness of ASF." Counterclaim (Document No. 5) ¶ 11. These allegations are well-suited to defendants' malicious-breach-of-contract theory, which I have discussed at length in this opinion, but they are insufficient to state a claim under Pennsylvania law for the tort of intentional interference (by another party to the contract) with economic relationships. Therefore, I still conclude that Count II of the counterclaim must be dismissed, notwithstanding defendants' eleventh-hour modification of their legal theory.

IMSSC's motion to dismiss Count II of the counterclaim will be granted.