J-E04002-24&emsp;&emsp;&emsp;&emsp;2025 PA Super 138

| | | |
|---|---|---|
| ANN MARIE SWATT, PERSONAL REPRESENTATIVE OF THE ESTATE OF MADLYN BLUSIUS | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| NOTTINGHAM VILLAGE; NOTTINGHAM MANAGEMENT, LLC; NOTTINGHAM VILLAGE RETIREMENT CENTER, LLC; NOTTINGHAM VILLAGE HEALTHCARE SERVICES, INC.; LEEDS HEALTHCARE SERVICES, INC.; SYNERGY GRANDVIEW PHARMACY, LLC; AND FREDERICK KESSLER | : : : : : : : : : : : | No. 1506 MDA 2021 |

Appeal from the Order Entered October 12, 2021
In the Court of Common Pleas of Northumberland County Civil Division at
No(s): CV-2014-00830

| | | |
|---|---|---|
| JANICE HAWBAKER, ESQ., EXECUTRIX OF THE ESTATE OF MADLYN BLUSIUS | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : : | |
| | : | |
| NOTTINGHAM VILLAGE; NOTTINGHAM MANAGEMENT, LLC; NOTTINGHAM VILLAGE RETIREMENT CENTER, LLC; NOTTINGHAM VILLAGE HEALTHCARE SERVICES, INC.; AND LEEDS HEALTHCARE SERVICES, INC. | : : : : : : : | |
| | : | |
| APPEAL OF: ANN MARIE SWATT, PERSONAL REPRESENTATIVE OF THE ESTATE OF MADLYN BLUSIUS | : : : | No. 1507 MDA 2021 |

Appeal from the Order Dated October 12, 2021
In the Court of Common Pleas of Northumberland County Civil Division at
No(s): CV-2014-00005

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., STABILE, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., KING, J., SULLIVAN, J., and BECK, J.

OPINION BY KUNSELMAN, J.:                    **FILED: JULY 2, 2025**

## I.    Introduction

In this survival action, Ann Marie Swatt, as Personal Representative of her Aunt Madlyn Blusius' Estate, appeals from the order granting summary judgment in favor of the Defendants on her claims for malpractice and breach of contract. We granted *en banc* review in this case and ***Poteat v. Asteak***, 729 EDA 2023, 2024 WL 2813104 (Pa. Super. 2024), to determine whether the gist-of-the-action doctrine allows trial courts to convert contract claims into tort claims. **See** Superior Court Order, 7/2/24, at 2. As we explain, it does not. Thus, we partially reverse the grant of summary judgment.

## II.    Factual Background

In 2006, Madlyn[1] resided in an assisted-living center. She was "in really good shape." Deposition of Ann Marie Swatt, 7/24/19, at 45. Unfortunately, Madlyn fell, fractured her hip, injured her right knee, and had to undergo reconstructive surgery.

Thereafter, on July 20, 2006, Madlyn's sister, Elizabeth Swatt, moved Madlyn into a nursing-care facility in Northumberland County. Leeds Health Care Services, Inc. owned and ran the nursing home, known as Nottingham Village. Madlyn's admission was "for rehabilitation, to learn how to walk again

---

[1] We refer to Elizabeth Swatt, Ann Marie Swatt, and Madlyn Blusius by their first names; we refer to Elizabeth and Ann Marie collectively as "the Swatts."

after a hip fall," and to heal her knee. *Id.* at 21. Elizabeth, signing as the "Responsible Party" for Madlyn, executed a written contract with the Nursing Home, the "Nottingham Village Nursing Center, Admission Agreement: Nursing Care." Ann Marie's Opposition to Nursing Home's Motion for Summary Judgment, Ex. A ("Contract").[2]

Under the Contract, the Nursing Home agreed to give a "room, meals, housekeeping services, use of walker or wheelchair when medically necessary, nursing care, linen and bedding, and such other personal services as may be required for the health, safety, welfare, good grooming and well-being of" Madlyn. *Id.* Madlyn's rights as the resident were "primarily for services, with a contractual right of occupancy." *Id.*

The Swatts visited Madlyn several times a month during the five-and-half years that Madlyn lived there. Deposition of Ann Marie Swatt, 7/24/19, at 16-17. Madlyn often complained to them that she disliked the Nursing Home and wanted to return to the assisted-living center, because "the people were nasty, and they didn't care for her." *Id.* at 130.

In her deposition, Ann Marie identified several deficiencies in Madlyn's care. These problems included an absence of orderlies and nurses during the Swatts' visits, a failure by the Nursing Home to feed and provide water to

---

[2] The contract of record is unpaginated, and Ann Marie omitted at least one page of it from Exhibit A. The bottom of the third page ends in the middle of Section 11, and the next page begins in the middle of subsection 12(d). Hence, the contract's page numbers after the missing page or pages are unknown. Therefore, we will not provide page citations for this document.

Madlyn, damage to Madlyn's teeth and gums, the appearance of new bruises and sores, failure to address pain in Madlyn's knee, lack of improvement or rehabilitation, soiled bed linens, and overmedication. Ann Marie complained and asked to speak with a nurse, but no one called her back.

These incidents occurred "a little bit at a time" while Madlyn resided in the Nursing Home. *Id.* at 49-50. Because of the Nursing Home's inaction and negligence, Madlyn "suffered dearly" and had "out of control" pain. *Id.* at 75. This caused "loss of her ability to be able to perform activities of daily living, loss of her ability to walk, and her death." *Id.* at 105. On January 5, 2012, Madlyn's kidneys failed, and she died in the Nursing Home, at the age of 91. *See id.* at 41, 76.

### III. Procedural History

These consolidated appeals, concerning Madlyn's death, have a lengthy and convoluted procedural history. In fact, multiple plaintiffs attempted to sue the Nursing Home and its Pharmacy, and they received three different docket numbers from the Prothonotary of Northumberland County. One of those cases was dismissed at preliminary objections, and it is not a subject of this appeal.[3]

The first of the other two dockets began when the Executrix of Madlyn's Will, Janice M. Hawbaker, Esq., filed a *praecipe* for writ of summons. Seven

---

[3] *See Elizabeth Jane Swatt & Ann Marie Swatt v. Nottingham Village*, CV-2014-25 (C.C.P. Northumberland) (dismissing complaint with prejudice upon preliminary objections, because the Swatts were not Madlyn's immediate family members; therefore, they lacked capacity to sue for wrongful death).

weeks after Madlyn's death, Attorney Hawbaker raised an Estate for Madlyn in Franklin County and received letters testamentary. *See In re Estate of Blusius*, Register of Wills' 3/21/12 Short Certificate, 2012-0054 (C.C.P. Franklin 2012). As Executrix, Attorney Hawbaker hired J. McDowell Sharpe, Esq. to sue the Nursing Home.

Nearly two years after Madlyn's death, on January 2, 2014, Attorney Sharpe filed a *praecipe* for the prothonotary to issue a writ of summons to the Nursing Home. He named Attorney Hawbaker, as "Executrix of the Estate of Madlyn Blusius," as the plaintiff. *Hawbaker v. Nottingham Village*, *Praecipe* for Summons at 1, CV-2014-5 (C.C.P. Northumberland 2014).[4] On March 21, 2014, the Nursing Home had the prothonotary issue a rule for Attorney Hawbaker to file a complaint.

While that rule was pending, a dispute arose in the Orphans' Court of Franklin County between Attorney Hawbaker and the Swatts over who should administer Madlyn's estate. The orphans' court ruled that Attorney Hawbaker had a "conflicting interest or . . . situation where [her] functioning as a fiduciary for a temporary period may not be in the best interests of the estate" to pursue the Northumberland County litigation. 20 Pa.C.S.A. § 4301.

---

[4] The *praecipe* also named as Defendants the Nursing Home's corporate entities: Nottingham Village; Nottingham Village, Inc.; Nottingham Village Retirement Center; Nottingham Village Retirement Center, LLC; Nottingham Village Retirement Center Associates; Nottingham Health Care Services, Inc.; and Leeds Health Care Services, Inc.

The orphans' court appointed Elizabeth "as Administratrix *pro tem* of the Estate of Madlyn M. Blusius for the sole purpose of pursuing any . . . causes of action against [the Nursing Home] or skilled-care providers who provided services to [Madlyn] between January 1, 2004 to the date of her death." **Estate of Blusius**, Orphans' Court Order, 4/11/14, at 1, 46-OC-2013 (C.C.P. Franklin 2014). However, the court allowed Attorney Hawbaker to remain as Executrix of the Estate and directed her to cooperate with Elizabeth "in her capacity as Administratrix *pro tem*." **Id.** The court permitted Elizabeth to enter a contingent-fee agreement with new counsel, Mary C. Kilgus, Esq., and to retain any proceeds from the Nursing Home lawsuit, after paying the inheritance taxes back to the estate. Finally, the Orphans' Court of Franklin County ordered Elizabeth to provide a copy of its order "to the Prothonotary of Northumberland County with a directive to the prothonotary to docket the order at CV-2014-005." **Id.** at 3.

Four days later, on April 15, 2014, counsel for Attorney Hawbaker filed a Motion to Enlarge Time to File Complaint in Northumberland County. The motion explained, "Estate proceedings have been contentious and . . . the Orphans' Court of [Franklin County] held a status conference, at which an Administratrix *pro tem* was appointed to represent the estate in this matter." **Hawbaker**, Motion to Enlarge Time to File Complaint at 2. Attorney Hawbaker requested more time "to allow for the appointment of Administratrix *pro tem* and for her to engage counsel to file a complaint." **Id.** Furthermore, "counsel for the defendants graciously concurred in this request." **Id.**

The motions judge in Northumberland County signed the proposed order accompanying the motion. The order stated, "Plaintiff **Janice M. Hawbaker**, Executrix of the Estate of Madlyn M. Blusius . . . has until May 14, 2014 to file a complaint in this matter." T.C.O., 4/16/14, at 1 (emphasis added).

The following week, on April 22, 2014, Attorney Kilgus, Elizabeth's new attorney, had her paralegal file the Franklin County order at the Northumberland County **Hawbaker** docket. However, Attorney Kilgus did not enter her appearance or substitute Elizabeth as plaintiff in **Hawbaker**.

Instead, a few weeks later, on May 13, 2014, Attorney Kilgus filed a complaint without a docket number. Additionally, the complaint's caption made no mention of Madlyn's estate or Elizabeth's role as Administratrix *pro tem*. The filing also added two new defendants, Synergy Health Systems and Frederick Kessler (the Nursing Home's Executive Director).

Attorney Kilgus captioned the complaint as follows:

| | | |
|---|---|---|
| ELIZABETH JANE SWATT | : | IN THE COURT OF COMMON |
| PLAINTIFF | : | PLEAS OF NORTHUMBERLAND |
| | : | COUNTY, PENNSYLVANIA |
| | : | |
| vs. | : | NO. |
| | : | |
| NOTTINGHAM VILLAGE, | : | |
| NOTTINGHAM VILLAGE, INC., | : | CIVIL ACTION – LAW |
| NOTTINGHAM VILLAGE | : | |
| RETIREMENT CENTER, LLC, | : | |
| NOTTINGHAM VILLAGE | : | MEDICAL MALPRACTICE |
| HEALTHCARE SERVICES, INC. | : | |
| LEEDS HEALTHCARE | : | |
| SERVICES, INC., SYNERGY | : | |
| HEALTH SYSTEMS, And | : | |
| FREDERICK KESSLER, | : | |
| DEFENDANTS | : | |

***Swatt v. Nottingham Village***, Complaint at 1. Thus, the complaint identified Elizabeth as Plaintiff, ***in her personal capacity***, and the prothonotary wrote a new docket number on the complaint: *i.e.*, "CV-2014-830."

Attorney Kilgus paid the filing fee for a new action and had the Sheriff of Northumberland County serve the complaint on the Nursing Home and Frederick Kessler. The sheriff also attempted, but failed, to serve it on Synergy Health Systems.

Thereafter, on May 29, 2014, in ***Hawbaker***, the Nursing Home filed a *praecipe* for a judgment of *non pros* against Attorney Hawbaker for failing to file a complaint. The Nursing Home's lawyer attached a certificate of service, indicating that he had sent a copy of the *praecipe* to Attorney Sharpe, because Attorney Sharpe never withdrew his appearance as counsel of record in that action.

- 8 -

However, once the prothonotary entered the judgment of *non pros*, the prothonotary never served the judgment on Attorney Hawbaker or her counsel. ***See*** Ann Marie's Notice of Appeal in ***Hawbaker***, CV-2014-5, Ex. C at 2. There was no entry in the "Service Information" column of the docket sheet, and the "Comment" column did not reference the fact or the date of service of the judgment of *non pros* upon anyone. In the "Comment" for the entry of judgment, the prothonotary only wrote, "Dated: 5/30/2014 Amount: $17.00 (cash) For: Nottingham Village (Defendant)." ***Id.***

Next, the Nursing Home filed preliminary objections to the complaint in ***Swatt***. On June 30, 2014, Attorney Kilgus filed an Amended Complaint on behalf of Elizabeth and replaced Elizabeth (in her personal capacity) as Plaintiff with "Elizabeth Jane Swatt, Personal Representative for the Estate of Madlyn Blusius, Deceased." ***See*** Amended Complaint at 1. The Amended Complaint also named "Synergy Grandview Pharmacy, LLC" as a defendant, in place of "Synergy Health Systems." ***Id.*** Additionally, Attorney Kilgus filed a document to withdraw the appearance of Attorney Sharpe in the ***Swatt*** matter, even though Attorney Sharpe was never counsel of record in that action.[5]

There were several more rounds of pleadings that resulted in Elizabeth filing the operative complaint in ***Swatt***. According to the operative complaint, Elizabeth brought "a medical-malpractice action, a survival action, and a

---

[5] In fact, Attorney Sharpe remains counsel of record for Janice Hawbaker, as Executrix of the Estate of Madlyn Blusius, the named plaintiff in ***Hawbaker v. Nottingham Village***, CV-2014-5 (C.C.P. Northumberland).

breach-of-contract action involving the avoidable death of Madlyn . . . ." Third Amended Complaint at 1. Elizabeth raised multiple counts in tort and contract.

The Pharmacy filed preliminary objections, which the trial court partially granted. The court dismissed Elizabeth's contract claim against the Pharmacy, because it ruled that she could not bring such a claim under the gist-of-the-action doctrine. *See* Trial Court Order, 5/14/15, at 1-2.

Then, the Pharmacy sought judgment on the pleadings. It argued that the two-year statute of limitations barred Elizabeth's malpractice claim.

Before the trial court disposed of that motion, on September 9, 2015, Attorney Kilgus withdrew as counsel for Elizabeth. The court stayed the action while Elizabeth searched for a new lawyer. On November 23, 2015, Matthew A. Thomsen, Esq. entered his appearance for Elizabeth.

Following briefing and oral argument, on April 8, 2016, the trial court granted the Pharmacy's motion for judgment on the pleadings. It ruled that Eizabeth sued the Pharmacy on May 13, 2014, more than two years after Madlyn's death. Six weeks later, Elizabeth moved for reconsideration or, in the alternative, for a determination of finality. The trial court never ruled upon that motion.

Five years of discovery ensued, and Elizabeth changed attorneys three times. Also, due to Elizabeth's increasing age and declining health, the Orphans' Court of Franklin County in *Estate of Blusius* replaced Elizabeth as Administratrix *pro tem* with her daughter, Ann Marie. Thereafter, on February

24, 2020, Ann Marie, as Personal Representative of the Estate of Madlyn Blusius, substituted as the Plaintiff in **Swatt**.

On June 23, 2020, the Nursing Home moved for summary judgment in **Swatt**. It contended Ann Marie "failed to satisfy the elements of [her] causes of action, but has brought survival claims that are barred by the applicable statute of limitations, and has brought a contract action in an attempt to shoehorn [Ann Marie's] time-barred negligence cause of action into a breach-of-contract claim." Motion for Summary Judgment at 5.

Ann Marie filed a response opposing the motion and attached six exhibits as her evidence. These included her deposition and the Contract with the Nursing Home. Ann Marie simultaneously filed a motion to correct the filing date in **Swatt**, *nunc pro tunc*. She sought to relate the complaint in **Swatt** back to January 2, 2014, the filing date of the *Praecipe* for Writ of Summons in **Hawbaker**.

Another year passed, and, on September 30, 2021, Timothy Grant Wojton, Esq. entered his appearance for Ann Marie. Two weeks later, the trial court issued an Opinion and Order granting summary judgment to the Nursing Home. It held that the two-year statute of limitations for tort claims barred Ann Marie's counts for malpractice. The court also ruled that the gist-of-the-action doctrine prevented her from suing for breach of contract. **See** Trial Court Opinion, 10/12/21, at 3-5.

Ann Marie timely appealed from the order granting summary judgment in **Swatt**. In addition, Ann Marie filed a notice of appeal in **Hawbaker** from

the summary-judgment order in **Swatt**, even though no one had moved for summary judgment in **Hawbaker**.[6]

Upon review of Ann Marie's docketing statement and notice of appeal filed in **Hawbaker**, this Court issued her a rule to show cause why we should not quash the appeal in **Hawbaker**, 1507 MDA 2021. We observed that Ann Marie's notice of appeal stated that she appealed from the order granting summary judgment entered in **Swatt**, but that order was not entered on the docket of **Hawbaker**. Our order suggested that the appeal in **Hawbaker** could not lie from the summary-judgment order entered on the **Swatt** docket.

Additionally, this Court indicated that the last entry in **Hawbaker** was the entry of judgment of *non pros* and that no one had petitioned to open or strike that judgment. We said, "Any appeal related to a judgment of *non pros* lies not from the judgment itself, but from the denial of a petition to open or strike." Show Cause Order, 3/17/22, at 1 (quoting **Bartolomeo v. Marshall**, 69 A.3d 610, 613-14 (Pa. Super. 2013); citing Pa.R.Civ.P. 3051, Comment).

Ann Marie replied to the rule and argued for the continued viability of her appeal in **Hawbaker**, docketed at 1507 MDA 2021, or, alternatively, to have it consolidated with her appeal in **Swatt**, docketed at 1506 MDA 2021.

---

[6] When Ann Marie filed her notice of appeal in **Hawbaker**, **supra**, she attempted to change the caption of the named plaintiff to herself, without moving to substitute herself in that role. We have restored the caption in that appeal to its original (and current) plaintiff. Although Attorney Kilgus filed the order from Franklin County with the Prothonotary of Northumberland County, nothing in that order directed substitution of Elizabeth for Attorney Hawbaker. While Ann Marie moved to substitute herself in **Swatt**, she did not do so in **Hawbaker**.

She contended that **Swatt** and the other matter that the Swatts jointly commenced on January 6, 2012 (which the trial court dismissed at preliminary objections) were continuations of **Hawbaker**. Ann Marie claimed that the Prothonotary of Northumberland County erroneously severed them into three separate lawsuits by assigning each filing its own docket number. In her view, all three lawsuits were one action by the Estate of Madlyn Blusius.

This Court withdrew its rule to show cause and deferred the question of appellate jurisdiction to the merits panel. We also consolidated the appeals in **Swatt** and **Hawbaker**.

Regarding **Swatt**, a panel of this Court, composed of President Judge Lazarus, Judge Bowes, and former-Justice Stevens, unanimously affirmed the trial court's grant of summary judgment on the malpractice claims, but it reversed as to the contract claims. Also, regarding **Hawbaker**, a majority of the panel, *i.e.*, President Judge Lazarus and former-Justice Stevens, quashed Elizabeth's appeal as untimely. However, Judge Bowes wrote separately to explain that, in her opinion, the **Hawbaker** appeal should be quashed as premature.

Ann Marie petitioned for rehearing before this Court *en banc*, which we granted and withdrew the panel decisions.

## IV. Analysis

Ann Marie raises three appellate issues which we have reordered for ease of disposition as follows:

1.  Did the trial court err or abuse its discretion in dismissing [the] Pharmacy from the suit due to . . . the statute of limitations . . . ?

2.  Did the trial court err or abuse its discretion in ruling that [Ann Marie's] survival action [against the Nursing Home] was time barred under the statute of limitations . . . ?

3.  Did the trial court err or abuse its discretion when it ruled that the gist-of-the-action doctrine bars [Ann Marie's] breach-of-contract claim . . . ?

Ann Marie's Substituted Brief at 4. Before addressing those claims, first we consider our appellate jurisdiction over **Hawbaker**, 1507 MDA 2021.

*A.    Appellate Jurisdiction over* **Hawbaker** *Case*

As this Court observed in its show-cause order, Ann Marie purports to appeal the **Hawbaker** case from an order that the trial court did not enter on the **Hawbaker** docket. Thus, she seeks to lift **Hawbaker** up to this Court by the boot straps of **Swatt**. We ask whether this is jurisdictionally permissible, given that the trial court did not enter an appealable order in **Hawbaker**.

The "appealability of an order goes to the appellate court's jurisdiction." **Williams v. Williams**, 385 A.2d 422, 423 (Pa. Super. 1978) (*en banc*). "The question of an appellate court's jurisdiction to consider any particular case may properly be raised *sua sponte.*" **Commonwealth v. Giffin**, 595 A.2d 101, 103 (Pa. Super. 1991). This presents "a question of law; the appellate standard of review is *de novo*, and the scope of review is plenary." **Crespo v. Hughes**, 292 A.3d 612, 615 (Pa. Super. 2023).

An order does not become "appealable until it has been entered upon the **appropriate** docket in the trial court." Pa.R.A.P. 301(a)(1) (emphasis

added). Here, the order granting summary judgment to the Nursing Home in *Swatt* was entered upon the appropriate docket in the trial court – *i.e.*, the *Swatt* docket, CV-2014-830. At that moment, it became an appealable order in that case.

However, the trial court never entered the summary-judgment order on the *Hawbaker* docket, CV-2014-5.[7] Nor should it have done so, because the parties in *Swatt* differ from the parties in *Hawbaker*, and a complaint was never filed in *Hawbaker*. Further, the Nursing Home did not file a motion for summary judgment in *Hawbaker*.

Regarding the differing parties, no one substituted Elizabeth or Ann Marie as the named Plaintiff in *Hawbaker*. Thus, Attorney Hawbaker remains plaintiff of record in *Hawbaker*. Ann Marie remains a stranger to that action. Accordingly, she lacks standing to appeal *Hawbaker* to this Court. Further, because there is no appealable order in *Hawbaker*, we have no appellate jurisdiction over that case.

_____

[7] Moreover, even if the trial court had entered its order granting summary judgment on the *Hawbaker* docket, we would still lack appellate jurisdiction over *Hawbaker*. Generally speaking, "an appeal may be taken as of right from any final order of a . . . trial court." Pa.R.A.P. 341(a). A final order is one that "disposes of all claims and of all parties . . . ." Pa.R.A.P. 341(b).

The summary-judgment order disposed of all claims by Elizabeth against the Nursing Home, but it disposed of none of the claims of Attorney Hawbaker against anyone. So, the order granting summary judgment would not meet the definition of a final order even if filed on the *Hawbaker* docket. At that docket number, the order would dispose of no claims and no parties. Without a final order we would have no jurisdiction over *Hawbaker* regardless.

Importantly, the prothonotary's entry of judgment of *non pros* for failure to file a complaint does not alter our finding that no final order exists in *Hawbaker*. As mentioned, *Hawbaker*'s docket entries reveal that the prothonotary never served notice of the entry of judgment of *non pros* on Attorney Hawbaker or her counsel, Attorney Sharpe.

Under Pennsylvania Rules of Civil Procedure 108, an order is officially entered on "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)." Pa.R.A.P. 108(b). Rule 236 imposes mandatory duties on the prothonotary in entering judgments. "The prothonotary **shall** immediately give written notice of the entry of . . . . any . . . order or judgment to each party's attorney of record or, if unrepresented, to each party. The notice shall include a copy of the order or judgment." Pa.R.C.P. 236(a)(2) (emphasis added). In addition, the "prothonotary **shall** note in the docket the giving of the notice and, when a judgment by confession is entered, the mailing of the required notice and documents." Pa.R.C.P. 236(b) (emphasis added).

If the prothonotary violates Rule 236, the judgment is **not** officially entered.[8] *See, e.g.*, *Mumma v. Boswell, Tintner, Piccola & Wickersham*, 937 A.2d 459, 464 (Pa. Super. 2007) (holding that the trial court erred in refusing to strike *non pros* judgments that were not properly entered because,

---

[8] We note that Ann Marie made a similar argument regarding the non-service of the judgment of *non pros* when responding to the Nursing Home's motion for summary judgment in *Swatt*. *See* Ann Marie's Response to Nursing Home's Surresponse for Summary Judgment . . . at 9-10.

the docket entries demonstrated "that the prothonotary did not provide [the plaintiff] with written notice of entry of the judgments and failed to note in the docket the giving of such notice"). We have held that this "is a bright-line rule, to be interpreted strictly," even if the party "did indeed receive notice . . . ." *In re L.M.*, 923 A.2d 505, 509 (Pa. Super. 2007).

Because the judgment of *non pros* was never officially served on the plaintiff of record in *Hawbaker*, that action remains pending in the original jurisdiction of the trial court. Given that Ann Marie is not a party to *Hawbaker*, and no final order was ever entered in *Hawbaker*, Ann Marie's appeal in *Hawbaker* is improper and premature. As a result, we quash her appeal at 1507 MDA 2021 as premature and only address Ann Marie's three substantive issues as they pertain to her appeal in *Swatt*.

B.      *Waiver of Judgment on the Pleadings to Pharmacy*

As her first appellate issue, Ann Marie challenges the grant of judgment on the pleadings to the Pharmacy. However, the Pharmacy responds that Ann Marie neglected to appeal the order granting it judgment on the pleadings or even to name the Pharmacy in her notice of appeal. Thus, the Pharmacy, which had to petition to intervene in this appeal (due to Ann Marie's failure to name it in her notice of appeal), contends that any argument Ann Marie has against it is waived. **See** Pharmacy's Substituted Brief at 14-23. We agree.

"The issue of waiver presents a question of law, and, as such, our standard of review is *de novo*, and our scope of review is plenary." ***Trigg v. Children's Hospital of Pittsburgh of UPMC***, 229 A.3d 260, 269 (Pa. 2020).

- 17 -

To perfect an appeal, the appellant must file a proper and timely notice of appeal. A proper notice of appeal must include the orders that the appellant intends to appeal and give notice to the appellees. *See* Pa.R.A.P. 904(a).

Here, Ann Marie neglected to include the order granting judgment on the pleadings to the Pharmacy in her notice of appeal. That order became final when the trial court disposed of the remaining claims and parties by granting summary judgment to the Nursing Home. ***See, e.g.***, ***Weible v. Allied Signal, Inc.***, 963 A.2d 521, 524–25 (Pa. Super. 2008) (permitting appeal where the trial court order, declaring the case settled as to all remaining parties, rendered prior grants of summary judgment to the non-settling parties final for purposes of appeal). Accordingly, Ann Marie's failure to identify the order granting judgment on the pleadings to the Pharmacy and to identify the Pharmacy as an appellee in her notice of appeal waives any claims related to the Pharmacy. ***See Jordan v. Pennsylvania State University***, 276 A.3d 751, 761 (Pa. Super. 2022) (holding that an appellant's failure to appeal trial court's order denying petition for relief from judgment of *non pros* renders all claims related to that order waived).

The trial court's failure to rule upon Ann Marie's motion to reconsider its grant of judgment on the pleadings or for a declaration of finality does not convince us otherwise. In Ann Marie's view, because the trial court did not enter an order declaring the grant of judgment on the pleadings final, the court never released the Pharmacy from the case. She cites no law for this

position, and our research has revealed none. *See* Ann Marie's Substituted Brief at 49. The assertion is incorrect.

A motion for judgment on the pleadings "provides all parties the means to make an early application for summary disposition of the case, giving the trial court the opportunity to make an overall examination of the pleadings in the action and . . . determine whether, prior to trial, ***judgment should be entered in the action.***" 6 PA. STANDARD PRACTICE 2d. §31:1 at 73-74 (1994 ed.) (emphasis added). When a motion for judgment on the pleadings is before the trial court, it "shall enter such judgment or order as shall be proper on the pleadings." Pa.R.C.P. 1034(b). Thus, the "ruling on the motion for judgment on the pleadings can be a final judgment in favor of either the plaintiff or the defendant." 6 PA. STANDARD PRACTICE 2d. §31:38 at 124.

Here, Elizabeth had one claim remaining against the Pharmacy when the Pharmacy moved for judgment on the pleadings. The trial court granted the motion and stated, "any and all claims asserted against [the Pharmacy] are DISMISSED with prejudice." Trial Court Order, 4/8/16, at 2. Thus, the trial court entered final judgment as between Elizabeth and the Pharmacy on April 8, 2016. The Pharmacy was released from the case at that point.

Elizabeth's motion for a declaration of "finality" was her attempt to appeal the order granting judgment on the pleadings immediately. She tried to take an interlocutory appeal by permission. Despite her unresolved motion, the order dismissing the Pharmacy became appealable when the trial court later entered summary judgment in favor of the Nursing Home. At that time,

the judgment-on-the-pleadings order also became final, by operation of law. In fact, Elizabeth acknowledged her understanding that the trial court's entry of judgment on the pleadings released the Pharmacy from the action. Elizabeth said, "allowing [the Pharmacy] to remain apart from this action until resolution of [her] claims against the remaining [Nursing Home] would allow for the degradation of potential witnesses memories, the potential destruction of files, and foreknowledge of [Elizabeth's] trial strategies by [the Pharmacy]." Elizabeth's Motion for Reconsideration or, Alternatively, for Finality at 17.

Clearly, the motion for reconsideration belies Ann Marie's claim that the trial court's failure to declare finality kept the Pharmacy in the case. Elizabeth sought a declaration of finality, because she knew that, without an immediate appeal to this Court, the Pharmacy would no longer be a party to the litigation. In her notice of appeal, however, Ann Marie omitted the Pharmacy and the order granting it judgment on the pleadings.

Thus, we dismiss Ann Marie's first issue as waived.

C. *Statute of Limitations of Malpractice Claims*

In her second issue, Ann Marie contends the trial court erred by ruling that the statute of limitations barred her survival action. She claims this issue "primarily involves application of Pennsylvania Rule of [Civil] Procedure 126 and the likelihood of administrative/clerical error." Ann Marie's Substituted Brief at 25. Ann Marie believes we should apply Rule 126 and, in the pursuit of substantial justice, overlook the fact that Attorney Kilgus filed the complaint in **Swatt** after the statute of limitations for personal-injury claims expired.

Ann Marie alleges Attorney Kilgus made a clerical error when filing the original complaint that commenced the **Swatt** action. **See id.** at 31-33. She asserts that Elizabeth, Attorney Kilgus, the Nursing Home, and the trial court all intended for Elizabeth's complaint to be docketed in **Hawbaker** by May 14, 2014. But, because Attorney Kilgus neglected to write the **Hawbaker** docket number on the original complaint, the Prothonotary of Northumberland County erroneously assigned a new docket number to the complaint and mistakenly bifurcated the **Hawbaker** action and the **Swatt** action. Ann Marie states, "whether this qualifies as a 'breakdown in operations,' a 'clerical error,' or even a filing error on [Attorney Kilgus'] part, this cannot and should not be seized upon by the defense as a means by which to dismiss and defeat what may very well be a meritorious case." **Id.** at 25-26.

In addition to Rule 126, Ann Marie also claims the Nursing Home waived the statute-of-limitations defense under Rule of Civil Procedure 1030, and that the Nursing Home is estopped from asserting the defense. **See id.** at 29-30; **see also** Ann Marie's Original Brief at 42-45. To support her estoppel claim, Ann Marie alleges the Nursing Home consented to Attorney Hawbaker's motion to enlarge the time to file a complaint in **Hawbaker**. Ann Marie further argues that the trial court failed to address her waiver and estoppel issues in either of its opinions.

Whether a party is entitled to summary judgment is a pure question of law; our standard of review is *de novo*. **See Pyeritz v. Commonwealth**, 32 A.3d 687, 692 (Pa. 2011). We view all facts and draw all reasonable

inferences therefrom in a light most favorable to the non-moving party. *See Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 195 (Pa. 2007).

Initially, we address Ann Marie's claims of waiver based on Rule 1030, estoppel, and liberal construction under Rule 126. She correctly contends that the trial court omitted these issues from its two opinions. However, Ann Marie caused this omission by failing to raise any of those theories below. *See* Ann Marie's Opposition to Nursing Home's Motion for Summary Judgment (making no claim of waiver, estoppel, or Rule 126 in reply to the statute-of-limitations defense) *and* Ann Marie's Response to Nursing Home's Surresponse for Summary Judgment . . . (accord).[9]

"As a general matter. . . issues not raised in lower courts are waived for purposes of appellate review, and they cannot be raised for the first time on appeal." *Trigg*, 229 A.3d at 269 (citing Pa.R.A.P. 302(a)).

Indeed, "issue preservation is foundational to proper appellate review." *Id.* This procedural prerequisite to appellate review "ensures that trial judges have the opportunity to consider a potential appellate issue and correct any error at the first available opportunity." *Id.* "It also promotes the orderly and efficient use of judicial resources, ensures fundamental fairness to the parties, and accounts for the expense attendant to appellate litigation." *Id.*

A review of Ann Marie's filings in response to the Nursing Home's motion for summary judgment reveals that she failed to mention Rule of Civil

---

[9] Our scope and standard of review for waiver are the same as in Section IV(B), *supra*, and we incorporate them here by reference.

Procedure 1030, waiver thereunder, or the doctrine of estoppel. Similarly, neither of Ann Marie's responses to the summary-judgment motion referred to Rule of Civil Procedure 126. She did not argue that the trial court should liberally construe the rules for commencing an action, substituting parties, or placing docket numbers on filings.

Thus, Ann Marie failed to preserve any claim of waiver under Rule 1030, estoppel, or liberal construction under Rule 126 for our appellate review. We dismiss those theories as waived. **See** Pa.R.A.P. 302(a).

That said, Ann Marie renews her claim to the trial court that the statute of limitations does not bar her survival claims, because **Hawbaker** and **Swatt** are one action. She says the trial court, in **Hawbaker**, granted Attorney Hawbaker, as Executrix of the Estate of Madlyn Blusius, "a deadline of May 14, 2014 'to file a complaint **in this matter**.'" Ann Marie's Substituted Brief at 39 (quoting T.C.O., 4/16/14, at 1) (emphasis by Ann Marie). She contends that this order is "evidence of the [Nursing Home's] agreement/understanding that the May 13, 2014 complaint was the next procedural step within the 'matter' timely-filed at [**Hawbaker**]." **Id.** at 40. Ann Marie believes, because everyone expected Elizabeth to file her complaint in the **Hawbaker** docket, she must have done so.

Summary judgment is appropriate if "the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." **Summers v. Certainteed Corp.**, 997 A.2d 1152, 1159 (Pa. 2010). Furthermore, a "plaintiff cannot survive

summary judgment when mere speculation would be required for the jury to find in [her] favor." ***Krauss v. Trane U.S. Inc.***, 104 A.3d 556, 568 (Pa. Super. 2014). The party opposing summary judgment must come forward with some evidence to "demonstrate that there is a genuine issue for trial and may not rest on averments in [her] pleadings." ***Davis v. Resources for Human Development, Inc.***, 770 A.2d 353, 357 (Pa. Super. 2001).

In Pennsylvania, there is a two-year statute of limitations to bring claims for personal injuries. "[A]ctions and proceedings must be commenced within two years," if brought "to recover damages for injury to person or property . . . sounding in trespass . . . ." 42 Pa.C.S.A. § 5524(7). Additionally, the Supreme Court of Pennsylvania held that "a survival action in a medical-professional-liability case resulting in death accrues at the time of death, not at the time of decedent's injury." ***Dubose v. Quinlan***, 173 A.3d 634, 647 (Pa. 2017). Hence, a survival-action plaintiff has two years from the date of the decedent's death to commence an action for personal injuries.

Madlyn died on January 5, 2012. Thus, any survival action following her death needed to be commenced by January 6, 2014.

A plaintiff commences a civil action "by filing with the prothonotary: (1) a *praecipe* for a writ of summons, or (2) a complaint." Pa.R.C.P. 1007. Once the plaintiff files a *praecipe* for a writ of summons or a complaint, the action has "been 'commenced,' [and] the statute of limitations . . . has been tolled." ***Salay v. Braun***, 235 A.2d 368, 371 (Pa. 1967).

Attorney Hawbaker filed her *praecipe* for writ of summons against the Nursing Home on January 2, 2014. Hence, she commenced her lawsuit within two years of Madlyn's death. The statute of limitations would not bar personal-injury claims in **Hawbaker**. By contrast, Elizabeth filed her original complaint on May 13, 2014, over two years and four months after Madlyn's death. Elizabeth's complaint in **Swatt** was untimely to bring tort claims.

As a result, Ann Marie can only maintain her malpractice counts, if the complaint that Elizabeth filed on May 13, 2014 is part of **Hawbaker**. The record reveals that the trial court correctly deemed that the two actions were separate proceedings, as a matter of law. Elizabeth's May 13, 2014 complaint was not a continuation of **Hawbaker**, to which the prothonotary mistakenly assigned a new docket number.

If Attorney Kilgus intended for Elizabeth's complaint to be a continuation of **Hawbaker**, there were several steps she needed to take to establish the continuity of a single action. First, she needed to enter her appearance in **Hawbaker**. **See** Pa.R.C.P. 1012. Then, she needed to file a statement of material facts to substitute Elizabeth for Attorney Hawbaker as the named representative of the estate/plaintiff in **Hawbaker**. **See** Pa.R.C.P. 2352(a). Attorney Kilgus did neither of those things.

Instead, the indisputable evidence shows that Attorney Kilgus captioned the complaint to bring an action in Elizabeth's personal capacity, rather than as the Administratrix *pro tem* of the Estate of Madlyn Blusius. The caption of the complaint did not include the words "estate" or "representative" in the

identity of the named "Plaintiff." Similarly, Attorney Kilgus added new defendants to the complaint who were not named in Attorney Hawbaker's *praecipe* for writ of summons. Thus, three of the parties in **Swatt** were not parties to the **Hawbaker** action.

Also, Attorney Kilgus left the line for the docket number of Elizabeth's complaint blank. "Every pleading shall contain a caption setting forth the name of the court, **the number of the action** and the name of the pleading." Pa.R.C.P. 1018 (emphasis added). By not including the **Hawbaker** docket number on the May 13, 2014 complaint, Attorney Kilgus undoubtedly indicated to the prothonotary an intent to commence a new action.

Additionally, Attorney Kilgus paid a new-action filing fee. The **Swatt** docket undoubtedly proves there was a "5/13/2014 Filing" and the fee for "Commencement of Any Civil Action Paid . . . $116.00." Docket Entries at 1.

Lastly, Attorney Kilgus had the sheriff serve the May 13, 2014 complaint on the defendants as original service of process. **See** Pa.R.C.P. 400(a). The sheriff had already served original process to the Nursing Home in **Hawbaker**, so this step was redundant if Attorney Kilgus intended to continue **Hawbaker**.

Unsurprisingly, the prothonotary did not write the **Hawbaker** docket number on the May 13, 2014 complaint. Nothing about Elizabeth's complaint or Attorney Kilgus' actions hinted that the complaint related to **Hawbaker,** or that she wanted to file it as a continuation of **Hawbaker**.

Moreover, there is no evidence of record reflecting that the prothonotary stopped Attorney Kilgus from filing the complaint in **Hawbaker**. And, even

- 26 -

if, the prothonotary refused to file the complaint in the *Hawbaker* docket due to the lack of a docket number on it, there is no explanation as to why Attorney Kilgus did not then simply write the *Hawbaker* docket number on the complaint and reoffer it for filing.

The only logical conclusion from the documents of record is that Attorney Kilgus intended to file the complaint as a new action and to create the *Swatt* docket. Even viewing the documents of record in the light most favorable to Ann Marie, no reasonable juror could find that Attorney Kilgus did anything other than commence a new civil action, on behalf of a new plaintiff, who was unrelated to the *Hawbaker* case. The May 13, 2014 complaint commenced a new civil action, as a matter of law.

It was not until Attorney Kilgus filed an Amended Complaint, on June 30, 2014, that she indicated that Elizabeth was suing as the personal representative of Madlyn's estate. And even then, she still failed to identify Elizabeth by the title that the Orphans' Court of Franklin County bestowed on her – "Administratrix *pro tem* for the Estate of Madlyn Blusius." Moreover, Attorney Kilgus neglected to move for consolidation of *Swatt* with *Hawbaker* or, alternatively, to have them deemed to be one action.

The Amended Complaints do not change our conclusion. Although Attorney Kilgus attempted to correct the name of the proper plaintiff when she filed the Amended Complaint, she did so without the consent of the adverse parties or an order granting leave of court, as required under Rule of Civil Procedure 1033. The Rule provides, in relevant part, "A party, either by

filed consent of the adverse party or by leave of court, may at any time change the form of action, add a person as a party, correct the name of a party, or otherwise amend the pleading."  Pa.R.C.P. 1033(a).

Further, Ann Marie fails to recognize that the May 13, 2014 complaint was filed in Elizabeth's personal capacity, instead of as the Personal Representative of the estate.  Therefore, she does not contend that any of the Amended Complaints, by merely replacing the named plaintiff, corrected Attorney Kilgus' initial filing error.  **See** Ann Maries' Substituted Brief at 28-48 (making no mention of the fact that the **Swatt** case was initiated by the wrong party in interest).

The named representative in a survival action for an estate matters.  "It is settled law that a decedent's estate cannot be a party to litigation unless a personal representative exists."  **Prevish v. Northwestern Medical Center Oil City Campus**, 692 A.2d 192, 200 (Pa. Super. 1997) (*en banc*), *affirmed*, 717 A.2d 1023 (Pa. 1998).  "Stated differently, all actions that survive a decedent must be brought by or against **the personal representative** of the decedent's estate."  **Id.** (emphasis added).

Thus, "the Estate," to which Ann Marie continually refers to as "the Plaintiff" in **Swatt** is a legal and factual misnomer.  An action on behalf of an estate may only be brought by the personal representative of the estate, when acting in that capacity, and such capacity must be disclosed in the initial pleading.  **See** Pa.R.C.P. 2002(b)(1).

Here, Attorney Kilgus did not disclose that she was filing Elizabeth's suit in Elizabeth's capacity as personal representative of the Estate of Madelyn Blusius, when she filed the initial pleading in **Swatt**, *i.e.*, the May 13, 2014 complaint.[10] Hence, the trial court correctly ruled that Ann Marie's six counts for medical malpractice against the Nursing Home were untimely. The court properly granted summary judgment to the Nursing Home under the statute of limitations on the tort claims.

We dismiss Ann Marie's second issue as meritless.

*D.   The Gist-of-the-Action Doctrine & Contract Claims*

Lastly, Ann Marie challenges the trial court's application of the gist-of-the-action doctrine to her contract claims. The trial court concluded that the contract claims were tort claims in disguise. It therefore applied the two-year statute of limitations to the contract claims and dismissed them as untimely.[11]

According to Ann Marie, "a litigant may proceed in both trespass and assumpsit in the same action . . . ." Ann Marie's Substituted Brief at 53. Given that "the duties and measure of damages in this case are different as between [her] negligence and contract claims, it was error for the [trial] court to bar the contract claims under the gist-of-the-action doctrine." **Id.** She contends that the "doctrine operates to foreclose tort claims arising solely from the

_____

[10] The *praecipe* for writ of summons filed in **Hawbaker**, **supra**, was not a pleading. **See** Pa.R.C.P. 1017.

[11] This issue also arises from a grant of summary judgment to the Nursing Home. Thus, our scope and standard of review are the same as Section IV(C), **supra**, and we reincorporate them here by reference.

- 29 -

contractual relationship between the parties when the alleged duties breached were grounded in the contract itself . . . ." *Id.* at 53-54. Thus, Ann Marie argues that the trial court erroneously applied the doctrine backwards to bar contract claims, rather than tort claims.

The Nursing Home responds that the gist-of-the-action doctrine bars contract claims, as well as tort claims. It primarily relies on ***Bruno v. Erie Insurance Co.***, 106 A.3d 48 (Pa. 2014), to contend that the essence of Ann Marie's "allegations . . . is not that a specific, contractual, executory promise was breached, but rather that [the Nursing Home] acted in a negligent manner in the performance of [its] duties; therefore, the gist of [Ann Marie's] cause of action is clearly negligence." *Id.* at 37. The Nursing Home then offers a string of post-***Bruno*** decisions from the federal courts, which applied ***Bruno*** in the same manner as the trial court in this case.

Reliance upon the gist-of-the-action doctrine and ***Bruno*** to convert Ann Marie's contract claims into tort claims is misplaced. The ***Bruno*** Court did not decide whether the gist-of-the-action doctrine applies to contract claims. As will become evident through our review of the history of the overlap between tort and contract claims, a plaintiff's choice of remedy (either in tort or in contract) is not necessarily binary. We acknowledge that some non-precedential decisions of this Court and federal cases have applied ***Bruno*** in the manner that the Nursing Home urges. Those decisions were incorrect.

The history of the common law and advent of the rules of civil procedure indicate that a plaintiff may bring contract claims, ***in addition to*** tort claims,

for the same unlawful conduct by a defendant. In fact, over the centuries, English and American courts have continually eased the rules of procedure and pleading to allow parties to develop all possible claims and defenses in the alternative. Created by a federal district court in 1999, the gist-of-the-action doctrine was an anomaly and inadvertent step backwards. Today, this appeal presents us with the opportunity to correct the error of applying the "doctrine" to dismiss contract claims, and we do so.

### 1. The Ancient Common-Law Writs & Forms of Action

In Medieval England, the filing of a lawsuit required a writ from the King that authorized a specific trial court to hear the case. A plaintiff had to choose among various types of writs and the "form of action" that the chosen writ authorized. There were many different forms of action available, and each presented would-be plaintiffs with "a choice between methods of procedure adapted to cases of different kinds." Maitland, THE FORMS OF ACTION AT COMMON LAW: A COURSE OF LECTURES at 2 (Cambridge U.P., 1965).

Each form of action was a "procedural pigeon-hole" with its own rules of substantive law and precedents. *Id.* at 4. A plaintiff, with multiple causes of action, might "find that his case [would] fit some two or three of these pigeon-holes." *Id.* The plaintiff had to choose one writ out of the many available, and that choice was irrevocable.

Also, the common-law-pleading system insisted that courts decide only a single issue of fact or law in each case. While this "produced administrative effectiveness with a vengeance, too often [it] did so at the expense of

substantive justice." Fleming James, Jr., *The Objective and Function of the Complaint: Common Law – Codes – Federal Rules*, 14 Vand. L. Rev. 899, 903 (1961). "[N]o one can forecast with certainty what the proof will bring forth in the way of facts, or of issues, or of the possible attitude towards facts and law that the tribunal may take . . . ." ***Id.*** Many cases "present two or more issues . . . which must all be resolved if full justice is to be done." ***Id.*** Thus, common-law procedure, which limited a plaintiff's causes of action and issues, was "bound to cause many a miscarriage of justice." ***Id.***

Because the writs procedurally and precedentially pigeon-holed the law, treatises and law-school "subjects" adopted those classifications; when "there are, of course, no such distinct compartments in the law." William L. Prosser, *The Borderland of Tort and Contract*, SELECTED TOPICS ON THE LAW OF TORTS at 380 (1953). Unlike countries on a map, "the fields of liability and doctrine interlock; everywhere there are borderlands and penumbras, and cases which cut across the arbitrary boundary lines of division, or staddle them . . . ." ***Id.*** In "one such borderland . . . the fields of tort and contract meet and are ***interwoven***." ***Id.*** (emphasis added).

In fact, prior to the 1500s, there was no separate writ of (and, therefore, no action to enforce) oral contracts. As a result, it was impossible for commoners (who could not read, much less draft, sign, and seal a written contract) to sue a smith, barber, surgeon, bailee, or common carrier for breaching oral promises. However, if such professionals physically or

economically harmed their customers by negligently performing their work, courts allowed an action for trespass on the case to lie. ***See id.***

As years passed and new factual scenarios emerged, the clerks of chancery gradually issued new writs, which, in turn, established new forms of action in the courts. One new writ, that emerged in the early 1500s, was the writ of assumpsit. This writ became "exclusively a contract action; and with it came the enforcement of executory promises, the necessity of consideration, and finally the contract implied in fact." ***Id.*** at 384.

The emergence of assumpsit created the substantive dilemma that we now face in this appeal – namely, whether contract and tort actions may be maintained simultaneously. Under common-law procedure, they could not, because the court of chancery would only issue one writ per plaintiff. Although there was a writ of trespass and a writ of assumpsit, there was no writ of trespass ***and*** assumpsit. So, plaintiffs simply chose the writ they thought best fit their case.

Plaintiffs often elected "the old tort action on the case in any contract situation in which it had been recognized." Prosser at 384. "Once it was clear that assumpsit would lie for any breach of contract, but that in certain situations there might still be a remedy in tort, the English courts began to be beset with problems." ***Id.*** at 385-86. As Dean Prosser highlighted, the question was whether the plaintiff could still bring a trespass action, even though assumpsit would clearly lie. In other words, "when was a breach of contract ***also*** a tort?" ***Id.*** at 387. (emphasis added).

To answer that question, courts looked to see if the "gist of the action" conformed with the form of action that the plaintiff brought. Critically, "gist of the action" was a legal term of art during the common-law-pleading era. The foremost treatise on common-law pleading from the mid-1800s teaches that the word "gist" was originally synonymous with "ground." Stephen, On Principles of Pleading in Civil Actions § 59, at 103 (2d. U.S. Ed, Chicago Press, 1901).[12] Additionally, in the 1800s, there were important "distinction[s] between the 'right of action,' the 'cause of action,' the 'ground of action,' and the 'subject of action.'" *Id.*

Stephen defines the "ground of the action" as "the act of the offending party, by means of which the injury is inflicted." *Id.* at 105. "It is the unlawful conduct, or conduct which might . . . be lawful, but which is rendered unlawful by the character of the intent or object of the act . . . ." *Id.* Thus, the defendant's intent "constitutes an important element of the gist of the action." *Id.* n.4. (citing *Morgan v. Andrews*, 64 N.W. 869, 871 (Mich. 1895)). In

_____

[12] The success of Stephen's treatise led to the publication of a second edition in 1827. Parliament abolished common-law pleading soon thereafter. In this country, however, common-law pleading remained in effect, and Stephen's second edition was a staple of the American bar. That edition is now a Rosetta Stone for deciphering pleadings and procedural decisions prior to the rules of civil procedure.

short, the ground/gist of the action was the defendant's unlawful act upon which the plaintiff's cause (or causes of action) would lie.[13]

Indeed, the Supreme Court of Pennsylvania used the phrases as synonyms in one of the earliest decisions containing the phrase "gist of the action." *See Griffith v. Ogle*, 1806 WL 1009, at *3 (Pa. 1806) (stating, "The old writ of conspiracy charges a conspiracy in the defendants; and that conspiracy is the ***ground of the action***. In the present action, likewise, the conspiracy is the ***gist of the action***, although it may be necessary to show some act in execution of it.") (original emphasis removed; emphasis added).

Furthermore, "the cause of action" meant ***only*** the injury (or injuries) that a plaintiff suffered from a defendant's unlawful conduct. "Cause of action" was frequently "confused with the unlawful conduct which gives rise to the injury, [*i.e.,*] the ground of the action; but the cause of the action designate[d] the nature of the injury . . . ." Stephen § 59 at 104. Therefore, a single ground/gist of the action might produce multiple injuries, that is, multiple

---

[13] ***See*** THE OXFORD ENGLISH DICTIONARY, *The Etymology of "Gist*," available at https://www.oed.com/dictionary/gist_n3?tl=true&tab=etymology (last visited 2/13/2025) (citing Kelvey's Rep. at 1502-3 (1688) (explaining that "gist" descended from Latin "*jacere*," meaning "to lie down," through the Old French, "*giser*," meaning "to lie.")). Thus, the ancient legal saying was "*(cest) action gist*," meaning "(this) action lies." ***Id.*** The O.E.D. still lists the original, legal meaning of "gist" as the primary definition: "The real ***ground*** or point (of an action, indictment, etc.)." ***Id.***, first definition of "gist," available at https://www.oed.com/dictionary/gist_n3?tl=true&tab=meaning_and_use (last visited 2/13/2025) (emphasis added). "Gist" did not acquire its modern, colloquial meaning of "substance or pith of a matter, the essence or main part," until approximately 1820. ***Id.***

causes of action. **See id.** at 105. Together, the "ground/gist of the action" and "cause of action" were known as the "subject of the action," a phrase "almost as comprehensive as the word 'transaction,' . . . ." **Id.**

In determining whether the cause of action would lie in trespass, the Court of King's Bench said, "if a party undertakes to perform work and proceeds on the employment, he makes himself liable for any misfeasance in the course of the work; but if undertakes and does not [do] the work, no action [in trespass] will lie against him for the nonfeasance." **Elsee v. Gatward**, 101 Eng. Rep. 82 (K.B. 1793). If the unlawful conduct was "nonfeasance" (no performance of a contract), the plaintiff's only remedy was in assumpsit. By contrast, if the act was "misfeasance" (negligent/defective performance of the contract), the remedy would lie in assumpsit but "may **also be** a matter of tort." Prosser at 388 (emphasis added).

Thus, 250 years ago, English courts recognized that, if a party to a contract committed an unlawful act, the other party could always sue in assumpsit. But the plaintiff might also sue in trespass, if the unlawful act was also a tort. When someone negligently performed a contract, "the older tort remedy carried over, wherever it was established, **as an alternative** to an action on the contract." **Id.** at 402 (emphasis added). For example, "a common carrier remained liable in tort, **as well as in contract**, for negligent injury to a passenger, for loss of his baggage, for carrying him past his station or putting him off at the wrong one, for ejecting him from the train, or even for insulting him." **Id.** at 402-03 (emphasis added).

In certain cases, the plaintiff could elect whether to file in trespass or in assumpsit. The courts honored the plaintiff's elected remedy, even if defendants contended that another form of action was more appropriate.

2.    The Plaintiff's Election between Tort and Contract at Common Law

In the landmark case of **Brown v. Boorman**, 8 Eng. Rep. 1003 (H.L. 1844), England's highest tribunal recognized that a plaintiff could sue in either trespass or assumpsit for the negligent performance of a contract. The House of Lords held that there is an implied duty in all contracts to perform the contract with reasonable care and skill.

There, the Boormans contracted with Brown, an oil broker, to deliver three shipments of oil to a customer in London. Brown agreed to collect the purchase price prior to each delivery. The customer went bankrupt, so Brown gave the last shipment to another person on credit. The Boormans never received the purchase price for that shipment.

The Boormans obtained a writ of trespass upon the case against Brown. They alleged that once Brown accepted their contract, he had a duty, "to use all reasonable care and diligence" to receive the purchase price before handing over the oil. *Id.* at 1004. They claimed Brown negligently performed that duty and cost them their profits. Brown pleaded not guilty, and the jury ruled for the Boormans.

Brown moved in arrest of judgment claiming the Boormans could not sue him in tort for negligently performing the contract. The trial court agreed and entered judgment, as a matter of law, for Brown.

The Boormans appealed. The intermediate appellate court held that one unlawful act (*i.e.*, one gist of the action) can produce multiple causes of action. Chief Justice Tindal, speaking for a unanimous court, said:

> There is a large class of cases in which the foundation of the action springs out of privity of contract between the parties, but in which, nevertheless, the remedy for the breach or non-performance is **indifferently either** assumpsit **or** case upon tort. Such actions are against attorneys, surgeons, and other professional men, for want of competent skill or proper care in the service they undertake to render; actions against common carriers, against shipowners on bills of lading, against bailees of different descriptions; and numerous other instances occur in which the action is brought in tort or contract, **at the election of the plaintiff**.

*Id.* at 1007 (emphasis added). Thus, it did not matter which writ (trespass or assumpsit) the Boormans used, because Brown's negligent performance of the contract was **simultaneously** a tort and a breach of contract. Thus, the appellate court reversed and reinstated the jury verdict for the Boormans.

The House of Lords granted Brown's petition for allowance of appeal. Brown conceded that, when there is a contract and "also a general duty, the plaintiff may have his election as to the form of action" between trespass and assumpsit. *Id.* at 1007. However, in his case, he claimed the Boormans "cannot have that election where the supposed duty is [only based on] the . . . agreement of the parties. In such a case, the cause of action is a contract and nothing else . . . ." *Id.* Further, Brown argued that, for the Boormans to maintain an action in assumpsit, they needed to plead and prove which express terms of the contract Brown breached.

- 38 -

The House disagreed and held that the Boormans did not need to allege and prove breach of an express term of the contract for assumpsit to lie. Instead, the House concluded that service contracts include an implied term that contractors will act with skill and care when fulfilling their obligations. Hence, by alleging and proving negligence by Brown the tort action, the Boormans simultaneously alleged and proved his breach of the implied term in the contract.

Lord Campbell said, "it is immaterial . . . whether the count is framed in tort or in contract." *Id.* at 1018. "Wherever there is a contract, and something to be done in the course of the employment . . . if there is a breach of a duty in the course of that employment, the plaintiff may either recover in tort or in contract." *Id.* at 1018-19.

Significantly, this became the American rule. *See* Prosser at 407, n. 135-57 (collecting cases from American courts). Indeed, the Supreme Court of Pennsylvania came to the same holding as Lord Campbell, in *M'Call v. Forsyth*, 4 Watts & Serg. 179 (Pa. 1842). There, the plaintiff was riding in a stagecoach that several people jointly owned, including William M'Call and Abraham Horbach. The stagecoach wrecked and injured the plaintiff. He obtained a writ of trespass to recover damages. However, the sheriff only served M'Call and Horbach.

As in *Brown*, M'Call and Horbach contended the plaintiff needed to sue in assumpsit, because their duty arose from their contract to provide transportation. They argued that the plaintiff's tort claim was really a contract

claim.  The trial court disagreed and submitted the tort claim to the jury.  It returned a verdict for the plaintiff, and the defendants appealed.

The Supreme Court affirmed.  It held, when the common law imposes a duty on the defendant and the defendant contracts with the plaintiff for the same service as the common-law duty, negligent performance of the contract creates two causes of action.  The High Court said, "the true rule is, that [(1)] an action solely on the custom is an action of tort; [(2)] the plaintiff has his choice of remedies, either to bring *assumpsit* or [trespass on the] case; and [(3)] when one or other form of action is adopted, it must be governed by its own rules."  ***M'Call***, 4 Watts & Serg. at 180 (citing ***Brotherton at al.,*** 7 Eng. Rep. 343; ***Ansell v. Waterhouse****,* 18 Eng. Rep. 227; ***Bank of Orange v. Brown****,* 3 Wend. 158 (N.Y. 1829); and ***Zell v. Arnold****,* 2 Pen. & W. 292 (Pa. 1830) ("***Zell I***")).  Thus, the verdict in tort was affirmed, despite the fact that the plaintiff could have alternatively sued in contact.

A few years later, in ***Smith v. Seward***, 3 Pa. 342 (1846), the Supreme Court explained that "it has ***long been established*** that the plaintiff may declare in [trespass on the] case or assumpsit ***at his election*** . . . ."  ***Id.*** at 345. (emphasis added).  When either action lies, "the plaintiff may certainly waive the contract and go for a tort."  ***Id.***

Next, the Supreme Court expressly adopted ***Brown***, ***supra***.  In ***Wingate v. Mechanics' Bank***, 10 Pa. 104 (1848), a Pennsylvania bank agreed to collect funds on behalf of its customers, which the customers had previously deposited in two Mississippi banks.  For various reasons, the bank

failed to collect the funds and failed to inform the customers of that fact. The Mississippi statute of limitations on the customers' debts expired.

Eventually, the customers sued the Pennsylvania bank in assumpsit. The jury found that the bank breached its contract.

The bank appealed and argued that the customers did not plead or prove which specific terms of the contract it breached. The Supreme Court framed the issue, in part, as whether the bank breached the contract by negligently performing it. *See id.* at 108. The Court turned to the principles of agency law and **Brown** to ascertain the scope of the bank's contractual obligations.

The **Wingate** Court said, under **Brown**, "The law **implies a promise** from brokers, bankers, or agents, and attorneys, that they will . . . exercise competent skill and proper care in the service they undertake to perform; in which, if they fail, an action lies [in contract] to recover damages for the breach of their implied promise." *Id.* at 108 (emphasis in original).[14] Thus, the Supreme Court read an implied term into contracts that service providers will perform their contracts competently. The Court therefore affirmed the jury verdict in favor of the customers.

Fifty years later, the Supreme Court extended the implied promise from **Brown** and **Wingate** to laborers. In **Zell v. Dunkle**, 27 A. 38 (Pa. 1893)

---

[14] In fact, **Wingate** relied on Chief Justice Tindal's opinion in the appellate court, rather than the decision from the House of Lords. *See id.*, (citing **Boorman v. Brown**, 3 Q.B. (Ad. & E. N. S.) 511 (Exch. C. 1842), *affirmed sub nom.* **Brown v. Boorman**, 8 Eng. Rep. 1003 (H.L. 1844)). The opinion of Chief Justice Tindal aligned with the opinion of Lord Campbell. Thus, Lord Campbell's opinion on dual remedies reflects Pennsylvania law.

("***Zell II***"), the plaintiff contracted with the defendant to repair an engine and boiler. While the goods were in the defendant's workshop, a fire broke out and destroyed the engine and boiler. The plaintiff sued in assumpsit.

The trial court granted a nonsuit on the basis that the plaintiff elected the wrong form of action. According to the trial court, the plaintiff could only sue in trespass, because the plaintiff alleged that the defendant negligently stored the engine and boiler. The plaintiff appealed.

The Supreme Court said, "If there had been ***no previous contract*** relation between the parties, damages occasioned by the negligence of the defendants could have been recovered ***only*** in an action on the case," *i.e.*, in tort. ***Id.*** (emphasis added). However, the parties had contracted, and the engine and boiler came into the defendant's control pursuant to the terms of that contract. Therefore, the High Court read the implied promise from ***Wingate*** and ***Brown*** into the repair contract, a promise "implied from the nature of the express contract . . . to do what, in good faith and common fairness, ought to be done for the protection of their customer's goods." ***Id.***

When "a duty arises out of an implied undertaking to do an act requiring skill or fidelity, an action of assumpsit will lie to enforce the duty, or an action on the case for the tort involved in the breach of duty may be sustained." ***Id.*** at 39 (citing ***Reeside v. Reeside***, 49 Pa. 322 (1865)). If the defendant does not perfectly perform the contract:

> he is ***liable on his contract***, whether the cause of his failure be his negligence, his fraud, or his crime, for his contract is broken in either case. But if the cause of his failure be his own fraud or

> felony, he may, **at the election of his customer**, be proceeded against for his tort, in any appropriate form of action *ex delicto*.

*Id.* (emphasis added). Thus, the Supreme Court held that the plaintiff could sue in assumpsit for the defendant's negligence, but it still upheld the nonsuit due to insufficient proof of the alleged negligence.

These early cases demonstrate that, by the 20th century, a person could sue a service provider for negligently performing a contract in either tort or assumpsit.[15] ***See*** Prosser at 402-10 n. 104-157 (collecting cases regarding service providers). In such cases, "the plaintiff is entitled to sue either in contract or in tort, because the defendant's act is an unlawful interference with the right of the plaintiff, which is created by agreement between them, **and also** with a right which is created by law." Burdick, THE LAW OF TORTS at 16 (1906) (emphasis added). In other words, one unlawful act (one "gist of the action") inflicts two, distinct legal harms (two "causes of action").

However, courts established that plaintiffs could not recoup a windfall by recovering twice. This Court said, a plaintiff "cannot bring two separate suits for one cause of action and carry both suits to final judgments." **Burt v. N. Philadelphia Trust Co.**, 45 Pa. Super. 320, 324 (1911). In **Burt**, a plaintiff won a case against a bank in assumpsit and then immediately re-sued the bank in trespass for the same unlawful act. While it did not matter whether

---

[15] In 1964, the Supreme Court continued applying this rule and concluded that a plaintiff could sue in assumpsit when an airline's employees negligently performed a contract for common carriage. ***See Griffith v. United Air Lines, Inc.***, 203 A.2d 796 (Pa. 1964).

the plaintiff sued the bank in assumpsit or tort, "none of the cases hold that the bank is liable to the depositor in an action of tort **and** of assumpsit." **Id.** at 4 (emphasis added). We therefore vacated the plaintiff's second judgment.

Additionally, the statute of limitations may limit a plaintiff's recovery, regardless of the form of action. In **Jones v. Boggs & Buhl, Inc.**, 49 A.2d 379 (Pa. 1946), the plaintiffs (husband and wife) filed in assumpsit to recover economic and personal-injury damages for breach of contract. The wife had purchased a fur coat and developed a rash on her neck. The plaintiffs sued the store. The store raised the two-year statute of limitations and claimed the plaintiffs' assumpsit action was untimely, because the couple sought to recover for personal injury.

The Supreme Court concluded that the statute of limitations "imposes the period of limitation on the cause of action [*i.e.*, the type of injury], instead of Annexing it to the form of the action," – e.g., trespass vs. assumpsit. **Id.** at 381. Therefore, the statute operated to bar certain types of injuries – e.g., personal vs. economic. **See id.** at 380 (quoting the statute of limitations, that lawsuits "brought to recover damages for **injury** wrongfully done **to the person** . . . must be brought within two years.") (emphasis added).[16] As a result, any damages for personal injury were untimely.

---

[16] In 1954, the legislature enacted the Uniform Commercial Code, 13 Pa.C.S.A. §§ 2101–2725, and changed the statute of limitations for breach of a sale-of-goods contract to four years, regardless of whether the plaintiff's injuries were economic or personal. **See Gardiner v. Philadelphia Gas Works**, 197 A.2d
*(Footnote Continued Next Page)*

Nevertheless, the plaintiffs could still recover economic damages. The wife's testimony "would support a finding of a breach of contract entitling her to nominal damages at least,"[17] or "the jury may find from her evidence that she should recover back the $22 paid [for] the coat on a credit-payment plan . . . ." *Id.* Hence, the Supreme Court affirmed the grant of a nonsuit as to the personal-injury claim, but it reversed as to the economic claims and granted the plaintiffs a new trial.

3. <u>The Rules of Procedure & Right to Plead in the Alternative</u>

The early and mid-1900s saw American jurisdictions adopt rules of civil procedure that ended the common-law-pleading system and its procedural difficulties. Of particular concern for reformers was the common law's insistence on deciding a single issue in a lawsuit. The form of action took second place to effectuating full justice between the parties.

_____

612, 612 (Pa. 1964). The disposition in **Jones v. Boggs & Buhl, Inc.**, 49 A.2d 379 (Pa. 1946), barring the wife's personal-injury claim no longer applies to sales of goods. However, the **Jones** Court's application of the non-UCC statute of limitations to differing forms of remedy remained "sound rationale, *i.e.*, that the express language of the [general statute of limitations] should not be avoided or circumvented . . . by allowing a party . . . to sue in one form of action, assumpsit, instead of another, tort." *Id.* at 613 (some punctuation omitted).

[17] At the time, Pennsylvania adhered to the common-law rule that, because breach of contract originated from the intentional tort of deceit, every breach of contract entitled the plaintiff to, at a minimum, nominal damages. *See* J.B. Ames, *The History of Assumpsit: Part I. – Express Assumpsit*, 2 Harv. Law Rev. 1 (1888).

On January 1, 1947, the Pennsylvania Rules of Civil Procedure took effect and replaced the common-law-writ system with a writ of summons or the filing of a complaint. **See** 1947 Edition of the Pennsylvania Rule of Civil Procedure, Rule 1007. The various forms of action of trespass and assumpsit remained, and the plaintiff retained the right to elect between the two actions.

Additionally, the new rules allowed parties to plead their claims and defenses in the alternative. **See id.**, Rule 1020(c); **see also Martin v. Wilson**, 92 A.2d 193, 195 (Pa. 1952) ("the [trial court held] it would have been obviously inconsistent for the defendant to assert nonliability, because the agreement was not in writing and at the same time aver that there was no agreement at all. But the objection to such inconsistency in pleading has now been overcome by Pa.R.C.P. 1020(c)."). The purpose of the Rules of Civil Procedure was to increase the parties' access to the courts and to elevate substance over the common-law forms.

Furthermore, as late as 1982, courts still understood that "gist of the action" meant the defendant's unlawful conduct. In a case involving a lender's negligent performance of a mortgage, this Court said, "The action here . . . was properly brought in assumpsit, though sounding in tort. The gist of the action was defendant's negligence and though it might have been brought in trespass, the real issue was whether defendant was guilty of neglect in the performance of its contract." **Mancine v. Concord-Liberty Savings & Loan Assoc.**, 445 A.2d 744, 747 (Pa. Super. 1982) (quoting **Siegel v. Struble Bros., Inc.**, 28 A.2d 352, 354 (Pa. Super. 1942)). Thus, plaintiffs could still

proceed in either form of action, when a single gist simultaneously breached a duty of care and a contract.

Then, in 1983, the Supreme Court gave plaintiffs even greater flexibility by eliminating the common-law forms of action in favor of one "civil action." "All claims heretofore asserted in assumpsit or trespass shall be asserted in one form of action to be known as 'civil action.'" 1983 Edition of the Pennsylvania Rules of Civil Procedure, Rule 1001(b)(1); 13 Pa.B. 53 at 3999.

The rules from **Brown** and **Wingate**, decided in the 1840s, became a part of the Rules of Civil Procedure, because a plaintiff could sue for negligent performance of a contract in either tort or contract. The Rules simplified the process by allowing plaintiffs to sue in **both** forms of action. "If a transaction or occurrence gives rise to **more than one cause of action** heretofore asserted in assumpsit and trespass, against the same person, including causes of action in the alternative, they shall be joined in separate counts in the action against any such person." Pa.R.C.P. 1020(d) (emphasis added). That Rule expressly authorizes plaintiffs to bring two counts for the same unlawful act.

In addition, the statutes of limitations still bar certain damages. For example, in 1985, this Court said, in determining which limitation period "will control, it is necessary to determine the **nature of the damages** sought to be recovered." **Murray v. University of Pennsylvania Hospital**, 490 A.2d 839, 842 (Pa. Super. 1985) (emphasis added). "If recovery is sought for the cost of completing performance of the contract or remedying defects in performance, the applicable statute of limitations [is four] years." **Id.** (citing

*Jones*, *supra*; *Colvin v. Smith*, 276 A.D. 9, 92 N.Y.S. 2d 794 (N.Y. App. 3rd Div. 1949)). "If, however, the damages sought to be recovered are for personal injuries, the two-year period of limitation is clearly applicable." *Id.* Therefore, in *Murray*, we barred a patient who suffered a failed tubal ligation and her husband from asserting personal injuries under the two-year statute of limitations. However, we allowed the couple to sue the wife's doctor for economic damages from the breach of contract, because they sued within four years of the operation. *See id.* at 438 (citing RESTATEMENT SECOND OF CONTRACTS §§ 347, 348 (1979)).[18]

4.    The Emergence of "Gist-of-the-Action Doctrine"

Despite the long-standing right of plaintiffs to elect a remedy between contract and tort, in 1999, the United States District Court for the Western District of Pennsylvania radically departed from that tradition. In *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F. Supp.2d 644, 651 (W.D. Pa. 1999), a plaintiff filed a complaint with multiple counts, including breach of contract, fraud, and negligent misrepresentation.

The defendants filed a Federal Rule 12(b)(6) motion to dismiss the non-contract claims. They argued that the "plaintiff's misrepresentation claims should be dismissed because this action fundamentally sounds in contract, not

_____

[18] Although the *Murray* Court applied an earlier version of the statutes of limitations, under the Statutory Construction Act, we apply the same interpretation to the current version, because the legislature used substantially similar language regarding the nature of the injury. *See* 1 Pa.C.S.A. 1922(4).

in tort, and under Pennsylvania's 'gist-of-the-action' doctrine, tort claims cannot be maintained when they essentially duplicate an action for breach of an underlying contract." **Sunquest**, 40 F. Supp.2d at 651. It appears the defendants coined the phrase "gist-of-the-action **doctrine**" and incorrectly branded it as Pennsylvania law. Critically, they also used the wrong definition of "gist," *i.e.*, the modern meaning of "essence" or "gravamen" of the plaintiff's action, instead of its historical, legal definition of a defendant's unlawful act.

Regrettably, the Western District took the defense's representations at face value and presumed that there was, in fact, an established "gist-of-the-action doctrine" in Pennsylvania. The court also adopted the defense's modern definition of "gist" and concluded that the "essence" of the lawsuit was breach of contract. Therefore, it dismissed the fraud and negligent-misrepresentation claims, as a matter of law, even though the plaintiff properly pleaded such claims in its complaint. In dismissing the tort claims, the district court became the first in history to adopt the phrase "gist-of-the-action doctrine." **See** Alex A. Tsiatsos, *The Gist of the Action Doctrine: Lessons from Pennsylvania's Search for Cause of Action Essence*, 119 W. Va. L. Rew. Online 1, 2 (2016).[19]

---

[19] **See also** BLACK'S LAW DICTIONARY (10th Ed. 2014) at 805 (indicating that the entomological origin of "gist-of-the-action doctrine" is circa 2000 and stating, "This term is most common in Pennsylvania but also appears in New Jersey, Delaware, the Virgin Islands, and elsewhere"). Indeed, Tsiatsos indicates in his article that the "doctrine" escaped across state lines thanks to the Third Circuit's precedents and jurisdiction to those states and the U.S. Virgin Islands.

By doing so, the district court resurrected the stringent, common-law-writ system and forced plaintiffs to sue in either tort or contract. Further, it eliminated the plaintiff's right to elect the remedy, by relegating the plaintiff to contract alone. Hence, **Sunquest** created a more restrictive process than the common law and named it the "gist-of-the-action doctrine."

Once a case such as **Sunquest** is "recorded for a precedent . . . many an error, by the same example, will rush into the state." William Shakespeare, *The Merchant of Venice*, Act. IV, sc. 1, lines 228-230. Fifteen years' worth of error rushed into this Commonwealth following the decision in **Sunquest**.

Pennsylvania trial courts soon began applying this new "doctrine" to dismiss tort claims, but not contract claims, whenever plaintiffs alleged both causes of action. The first court to do so in a published decision said, "the misrepresentations on which plaintiffs depend are misrepresentations in the course of performance, which, under Pennsylvania's 'gist of the action' doctrine, are not actionable in fraud." **Foodarama Supermarkets Inc. v. American Ins. Co.**, 43 Pa. D. & C.4th 467, 488 n.59 (C.C.P. Philadelphia 2000) (citing **Sunquest**).[20]

_____

[20] Under Pennsylvania law, an intentional misrepresentation is the unlawful conduct – the very gist of the action – for fraud. "Fraud must be averred with particularity by the following elements: 1) a **misrepresentation**; 2) a fraudulent utterance of it; 3) the maker's intent that the recipient be induced thereby to act; 4) the recipient's justifiable reliance on the misrepresentation; and 5) damage to the recipient proximately caused." **Sevin v. Kelshaw**, 611 A.2d 1232, 1236 (Pa. Super. 1992) (emphasis added).

Two years later, this Court adopted the gist-of-the-action doctrine from federal cases in **eToll, Inc. v. Elias/Savion Advertising, Inc.,** 811 A.2d 10 (Pa. Super. 2002). There, a software developer sued its marketing company for negligently performing an advertising contract. The marketing company also falsified bills for work that its agents never performed, and the developer paid those bills. Thus, the marketing company "stole money from [the developer] under the guise of performing the contract." **Id.** at 12.

The defendants moved for summary judgment on the tort claims, based on the "gist-of-the-action doctrine." The trial court agreed and dismissed the tort claims. The developer appealed.

A panel of this Court adopted the doctrine and affirmed, even though the panel acknowledged that the Supreme Court had never recognized such a doctrine. Undeterred, the **eToll** Court said the doctrine "was recognized by this Court for the first time in **Bash v. Bell Telephone Co.,** 601 A.2d 825 (Pa. Super. 1992),"[21] and barred the developer's tort claims as sounding in contract. **Id.** at 14.

_____

[21] The panel's reliance upon **Bash v. Bell Telephone Co.,** 601 A.2d 825 (Pa. Super. 1992) was misplaced. The **Bash** Court did not "recognize" the gist-of-the-action doctrine in 1992. Instead, it quoted the same section of the Eastern District's 1977 case that **Sunquest** eventually relied upon when it created the doctrine in 1999. **See Bash**, 601 A.2d at 355-56. **Bash** also drew from **Iron Mountain Security Storage Corp. v. American Specialty Foods, Inc.**, 457 F. Supp. 1158 (E.D. Pa. 1978), the following quote:

> Although they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed

*(Footnote Continued Next Page)*

The gist-of-the-action doctrine, as **eToll** adopted it, "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." **eToll**, 811 A.2d at 14. Based on four unpublished, federal decisions, **eToll** said, "the doctrine **bars tort claims**: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded

---

> at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals. To permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled **forms of actions**.

**Bash**, 601 A.2d at 829 (quoting **Iron Mountain**, 457 F. Supp. at 1165) (emphasis added) (some punctuation omitted).

**Iron Mountain** based its holding on the "distinct differences between civil actions for tort and contract." **Id.** In other words, the **forms of action**, due to common-law writs, which compelled plaintiffs to "pigeon-hole" their lawsuits into either an action for tort or an action for assumpsit. **See** THE FORMS OF ACTION AT COMMON LAW: A COURSE OF LECTURES at 4 (Cambridge U.P., 1965). Because separate forms of action for trespass and assumpsit still existed in Pennsylvania at the time of **Iron Mountain**, the common-law prohibition that "causes *ex delicto* and *ex contractu* cannot be joined in the same action" still held sway. **Baccini v. Montgomery**, 46 Pa. D. & C.2d 219 (C.C.P. Del. 1969). Pennsylvania plaintiffs needed to make their election of remedy at the outset of their case. Thus, the plaintiff in **Iron Mountain** could not join assumpsit and trespass counts in a single lawsuit.

By the time of **Bash**, separate forms of action no longer existed. "The procedural distinctions between the forms of action in assumpsit, trespass and equity are abolished." Pa.R.C.P. 1001, *Note*. Thus, the Supreme Court had ended the pigeon-holing of plaintiffs' complaints. The Rules of Civil Procedure permitted all causes of action to be pleaded, even in the alternative, in one civil action. Therefore, the concerns and the rationale of the **Iron Mountain** Court for preserving "our well-settled forms of actions" no longer applied. **Iron Mountain**, 457 F. Supp. at 1165.

in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." ***Id.*** at 19 (emphasis added) (some punctuation and citations omitted).

Like ***Sunquest***, the ***eToll*** Court elected the contract claims for the plaintiff and dismissed the tort claims. Notably, ***eToll*** never hinted, much less held, that the gist-of-the-action doctrine applied in reverse, *i.e.*, that it prevented plaintiffs from bringing contract claims when the breach of contract might also be a tort.

After ***eToll***, this Court and other Pennsylvania courts began a quixotic quest to distill the legal essence of plaintiffs' lawsuits to determine whether tort claims could proceed. Specifically, we stated that the "gist-of-the-action doctrine precludes a party from raising ***tort claims*** where the essence of the claim actually lies in a contract that governs the parties' relationship." ***Sullivan v. Chartwell Inv. Partners, LP***, 873 A.2d 710, 718 (Pa. Super. 2005) (emphasis added). Similarly, BLACK'S LAW DICTIONARY (10th Ed. 2014) explained, "The doctrine prevents plaintiffs from recasting contract claims as tort claims." ***Id.*** at 805. Under ***eToll*** and its progeny, we only applied the gist-of-the-action doctrine to bar tort claims, not contract claims.

5.  The Reformed Gist-of-the-Action Doctrine

In 2014, the Supreme Court granted allowance of appeal in ***Bruno v. Erie Insurance Co.***, 106 A.3d 48 (Pa. 2014), to examine the gist-of-the-action doctrine relative to a plaintiff's tort claims. In ***Bruno***, a husband and

wife purchased insurance for a new home. A few months later, they informed the insurance company there was mold in their basement. The company sent an adjuster and engineer to investigate. Afterwards, they informed the Brunos that the mold was harmless to humans. *See Bruno*, 106 A.3d at 51-53. The Brunos relied on this advice, remained in the home, and became very ill from black mold. They sued the insurance company and asserted *only* tort claims.

Like the oil broker in *Brown* nearly 175 years earlier, the insurance company argued that the Brunos could not sue in tort, because the parties' contract established the extent of the company's duties. The trial court agreed and dismissed the case. The Brunos appealed, and this Court affirmed.

The Supreme Court granted review of "whether a *negligence claim* brought against an insurer by its insureds . . . was barred by the 'gist-of-the-action' doctrine on the grounds that the true gist or gravamen of the action was an alleged breach of the insurance contract . . . ." *Bruno*, 106 A.3d at 50 (emphasis added). The High Court held that the gist-of-the-action doctrine did not bar the Brunos' tort claims, even though the Brunos had a contract with the insurance company. *See id.* at 71.

The Court "endorsed the principle that, merely because a cause of action between two parties to a contract is based on the actions of the defendant undertaken while performing his contractual duties, this fact, alone, does not automatically characterize the action as one for breach of contract." *Bruno*, 106 A.3d at 63. *Bruno* recalibrated the gist-of-the-action doctrine as a test based on the duty that the defendant allegedly breached. The Supreme Court

rejected the "essence" test that this Court announced in **eToll**.[22] Therefore, **Bruno** overruled the **eToll** "essence" test and any decisions between 2002 and 2014, which applied that test to compel plaintiffs to sue solely in contract.

Notably, **Bruno** did not review whether the choice between tort and contract remedies is necessarily binary under the Rules of Civil Procedure. Because the Brunos did not bring a breach-of-contract claim, that question was not before the Justices. They only decided whether a tort claim could exist when the parties had a contract.

Thus, **Bruno** did not reconsider the long-standing right of plaintiffs to elect their remedy at common law, anytime one unlawful act breaches both a contract and a general duty. The **Bruno** Court did not hear argument on or consider the continued validity of cases such as **M'Call**, **Smith**, **Brown**, **Wingate** and their progeny. Moreover, we decline to presume that the Supreme Court abrogated that body of common law *sub silentio*. Those precedents remain in effect and allow plaintiffs to elect the remedy they seek to recover.

In short, contract claims never were, and are not now, subject to the gist-of-the-action doctrine. **Bruno** did not state (and our research revealed no binding authority) that the gist-of-the-action doctrine converts a plaintiff's

---

[22] We note that the broader issue of whether the "gist-of-the-action doctrine" ever actually existed or should continue to be a part of Pennsylvania law was not before the High Court. Moreover, the Brunos began their argument by conceding the existence of the doctrine and only argued the **eToll** "essence-test" was unworkable. **See Bruno v. Erie Insurance Co.**, 106 A.3d 48, 57-58 (Pa. 2014).

contract claims into tort claims. The doctrine does not extinguish contractual rights, simply because the defendant's conduct may also be a tort. Hence, we hereby overrule any post-**Bruno** cases of this Court and our trial courts that applied the gist-of-the-action doctrine as a binary choice of remedy to bar contract claims.[23]

      6.    <u>Ann Marie's Contract Claims</u>

Here, the trial court dismissed Ann Marie's counts for breach of contract under the gist-of-the-action doctrine, because the court ruled that those counts were, in essence, tort claims masquerading as contract claims. Based on our above discussion, the trial court erred.

Ann Marie's contract claims were:

> ***particular*** claims . . . that the duties breached were ones created by the parties by the terms of their contract — *i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract — and the claims are to be viewed as ones for breach of contract.

**Bruno**, 106 A.3d at 68 (cleaned up) (emphasis added).

---

[23] ***See, e.g.***, ***Johnstone v. Raffaele***, 241 A.3d 479 (Pa. Super. 2020) (non-precedential); ***Corliss v. Lee A. Ciccarelli, PC***, 272 A.3d 457 (Pa. Super. 2022) (non-precedential); and ***Outerlimits Techs., LLC v. O'Connor***, 311 A.3d 569 (Pa. Super. 2023) (non-precedential). In addition, we disapprove of the decision in ***New York Cent. Mut. Ins. Co. v. Edelstein***, 637 F. App'x 70 (3d Cir. 2016) (non-precedential), as wrongly decided. ***But see also***, ***Sibley v. Barr & McGogney***, 260 A.3d 132, *2 (Pa. Super. 2021) (non-precedential) (Stabile, J. correctly refusing to apply the gist-of-the-action doctrine to bar a plaintiff's contract claims and saying, "Under Pennsylvania law, a client may bring ***both*** a contract action and a tort action against a professional.")

She alleged the Nursing Home promised but failed to provide Madlyn with a "room, meals, housekeeping services, use of walker or wheelchair when medically necessary, nursing care, linen and bedding, and such other personal services as may be required for the health, safety, welfare, good grooming and well-being of" Madlyn. Ann Marie's Opposition to Nursing Home's Motion for Summary Judgment, Ex. A ("Contract"). These are specific promises in the Contract, *i.e.*, contractual duties sufficient to maintain breach-of-contract claims.

Ann Marie also averred that the Nursing Home negligently performed its contractual duties to Madlyn. Thus, like the Boormans in ***Brown*** and the bank customers in ***Wingate***, her pleading effectively alleged that the Nursing Home breached its implied promise to perform the Contract in a professionally skillful and competent manner. ***See Brown*** and ***Wingate***, ***supra***. Ann Marie's contract claims may proceed to trial.

To the extent she seeks to recover economic damages (as opposed to personal injuries), arising from the Nursing Home's breach of contract, Ann Marie's final issue is meritorious. ***See Jones*** and ***Murray***, ***supra*** (allowing economic damages to proceed but barring damages for personal injuries under that two-year statute of limitations).

### V. Conclusion

In sum, we affirm the dismissal of all claims against the Pharmacy. Also, the trial court correctly ruled that ***Hawbaker*** and ***Swatt*** are separate actions; ***Hawbaker*** is not properly before us in this appeal. In ***Swatt***, the trial court

correctly dismissed Ann Marie's claims for Madlyn's personal injuries arising from medical malpractice as untimely, because the two-year statute of limitations bars them.

Finally, the trial court misapplied the gist-of-the-action doctrine to bar Ann Marie's contract claims. Since early common law, plaintiffs could freely elect their remedy and sue in either contract or tort, when the facts supported both forms of action. Today, the Rules of Civil Procedure allow a plaintiff to plead both tort and contract claims in the same lawsuit.

After ***Bruno***, Pennsylvania courts must review each claim individually to determine whether the plaintiff has alleged or offered sufficient proof (depending on the stage of the proceedings) that the defendant breached the ***particular*** duty (tort or contractual) for each ***particular*** claim. If so, the claim proceeds to trial. Courts should keep in mind that there are instances when a single gist of the action (one unlawful act) breaches ***both*** a general duty of care, as well as an expressed or implied contractual duty. While double recovery for the same unlawful act is generally prohibited, multiple claims can proceed to trial, if timely filed.

Order at 1506 MDA 2021 affirmed in part and reversed in part. Case remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

Appeal at 1507 MDA 2021 quashed as premature.

P.J.E. Panella and Judges Dubow, Murray, Sullivan, and Beck join this Opinion.

P.J. Lazarus files a Concurring Opinion in which P.J.E. Panella and Judges Dubow, Kunselman, Murray, Sullivan and Beck join.

Judge Stabile files a Concurring/Dissenting Opinion.

Judge King files a Concurring/Dissenting Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/02/2025